THE DES MOINES NATIONAL BANK OF DES MOINES, Iowa, Appellant, v. E. R. SISSON, Appellee.

**Pledges:** SALE OF PLEDGED PROPERTY: ACCOUNTING: EVIDENCE: BURDEN OF PROOF. In this action involving chiefly an accounting for collateral deposited by defendant with plaintiff, it appeared that certain collateral notes had to defendants knowledge been sold, and 'did not thereafter appear in a subsequent list of collateral held by plaintiff; that defendants note for which the same were security had been delivered to him when paid, showing indorsements as payments were made thereon; that defendant's bank book during subsequent years had been balanced by plaintiff bank from time to time and delivered to him; and that defendant at no time protested or disagreed to the disposition made of the collateral. *Held*, sufficient to constitute an accounting for such amounts as plaintiff had received on the collateral; and that having once accounted the burden was not on plaintiff to again account therefor, and that if any mistake existed in the original accounting the burden was upon defendant to show it.

**Same:** EVIDENCE. The evidence relating to various other items of collateral is reviewed at length and it is held that defendant had received credit for all sums collected by plaintiff thereon.

**Same:** BURDEN OF PROOF: APPLICATION OF RULE. The intent of the rule as to presumptions and burden of proof, in actions for accounting, is not that it shall become a cover for indirection, thus relieving a party from disclosure of material facts within his knowledge; nor will it permit a party to profit from a bad memory, or complete forgetfulness of facts once within his knowledge.

*Appeal from Buena Vista District Court.*—HON. D. F. COYLE, Judge.

SATURDAY, JUNE 5, 1909.

THIS is an action in equity upon a promissory note and to foreclose security. There was a cross-bill filed by

the defendant, asking for an accounting for collateral. The principal controversy in the case arises upon the trial of such cross-bill. There was a decree for the defendant. Plaintiff appeals.—*Reversed.*

*F. F. Faville,* for appellant.

*James De Land,* for appellee.

EVANS, C. J.—The plaintiff brought its action upon a promissory note for $4,240 executed on May 15, 1902, but bearing date May 1, 1902, signed by the defendant and payable to the First National Bank of Storm Lake, and indorsed after due by the payee to the plaintiff herein. By way of cross-bill the defendant averred that he had transacted business for many years with the payee bank, and had deposited with it from time to time much collateral, and he prayed for an accounting on such collateral, and that the amount found due him upon such accounting should be applied upon said note. The defendant was an attorney at law and real estate agent at Storm Lake, and transacted his banking business with the said First National Bank of Storm Lake. The business involved in this controversy commenced some time prior to 1897. The defendant borrowed from the bank from time to time sums of money, giving his note therefor and securing the same with collateral. Such collateral usually consisted of notes and executory land contracts and leases. The method of dealing between the parties, so far as the collateral was concerned, was rather loose. When the bank received collateral, it issued a receipt therefor to the defendant, and placed the collateral paper in an envelope under defendant's name in a pouch. It kept no record of collateral securities upon its books. The defendant gave his personal attention in large part to the collection of such collateral, frequently withdrawing col-

lateral from the hands of the bank for the purpose of collecting the same or surrendering the same to the maker for other reasons. Sometimes collateral thus withdrawn would be returned; sometimes substitution of other collateral would be made; sometimes the money collected would be accounted for by the defendant to the bank; sometimes the money collected would be paid in by the defendant to the bank and placed by the bank to the credit of his general account, or indorsed as a credit upon his note or notes; sometimes collateral was withdrawn and surrendered to the maker because of some failure of performance of the land contract which supported the same.

It is claimed by the defendant that, whenever he withdrew collateral, he nearly always left his receipt therefor with the bank; but this was not always done, and, even when this was done, the method followed, as described by the defendant, was anomalous and confusing. He testified that, when he withdrew collateral, he left his receipt until he should either return it or should substitute other collateral for it. When he returned the same, or returned substituted collateral, or paid in the money, he then took up his receipt and destroyed it. If in lieu of withdrawn collateral he paid in the money, that money was placed to his credit. If he substituted other collateral, that was included in the next receipt for collateral issued to him by the bank. In either such case the bank would have nothing to show for the original collateral so withdrawn. This method of business resulted in some confusion in the collateral account between the parties. From the early part of 1897 until the bank went into the hands of a receiver in January, 1904, the money transactions between the parties amounted in total footings to more than $200,000. This footing is made up of the total of successive notes and bank balances. The bank issued successive receipts to the defendant for collateral received. Eight of such receipts are in evidence. At stated times

the bank listed to the defendant in a single receipt all collateral on hand at the time of such receipt, regardless of whether such collateral had been previously receipted for or not.    Such listing was understood by both parties to be a "summing up" of the collateral then on hand. Four of such summing up receipts are in evidence; the last one being dated June 9, 1902.    Some time prior to June 25, 1897, the defendant executed his note to the bank for $4,000.    He put up as collateral security three contracts of lease, one land sale contract, and three promissory notes secured by mortgage.    His note was payable June 25, 1897.    On July 15, 1897, he gave his note for $500 and put up as collateral two contracts of lease.    On March 1, 1898, a "summing up" receipt was issued to the defendant for collateral, on hand.    This included some of the collateral previously receipted for, and omitted other.    It also included new collateral. September 29, 1899, another "summing up" receipt for collateral was issued to the defendant, and again another such receipt issued on May 14, 1900, and the last on June 9, 1902, as already stated.    Under the arrangement between the parties, it was the duty of the bank to apply the proceeds of all collateral collected, to the credit of the defendant, either by placing the same to his personal account in the bank or by indorsing the same as a credit upon his note or notes.

On the trial of the case the defendant contended for the rule that the burden was upon the bank to account for all collateral received, and to stand charged with such as it could not account for.    The plaintiff contended that such rule should apply only to such collateral as was listed in its last "summing up" receipt.    The trial court, however, held that the bank was required to account for all collateral received by it during the entire period, and that the burden was now upon it to account for every item of collateral or to stand charged therewith.

The result of the trial was that the court found that
there were many items of collateral not sufficiently ac-
counted for by the bank, and that they amounted to the
total of more than the amount of the note, and a decree
was entered cancelling the note. For the most part the
items of collateral so charged against the bank were those
included in the earliest receipts, and which had not ap-
peared in the later "summing up" receipts for many
years. The complaint of the plaintiff is that the trial
court laid upon it an undue burden, and that it applied
the rule of burden of proof with a degree of strictness
that was not justified by the course of dealing between
the parties. It contends, also, that the rule as applied
by the trial court was not applicable to the facts in
the case, and that the result reached was not justified by
the evidence. This contention necessarily carries us into
a consideration of the voluminous evidence in the case.

The trial court made the following finding of credits
in favor of the defendant:

"Hayes Bros. item ........................ $ 156 00
    Interest ............................        26
George Egerer item ......................   150 00
    Interest ............................    41 00
George Egerer item ......................   150 00
    Interest ............................    38 60
E. F. Karney item .......................   125 00
    Interest ............................    20 30
E. F. Karney item .......................   250 00
    Interest ............................    35 58
L. E. Miller item .......................    60 00
    Interest ............................    19 94
L. M. Miller item (see infra for deduction)....  100 00
    Interest ............................    34 24
Ed Grosenbaugh item .....................   320 00
    Interest ............................    75 72

| | | |
|---|---:|---:|
| Bauman items (2) ....................... | 425 | 00 |
| Interest ............................ | 67 | 13 |
| Preston item ........................... | 53 | 30 |
| Interest ............................ | 4 | 80 |
| Preston item ........................... | 53 | 30 |
| Interest ............................ | 4 | 00 |
| Graves item ........................... | 133 | 33 |
| Interest ............................ | 14 | 02 |
| Anderson item .......................... | 150 | 00 |
| Interest ............................ | 13 | 60 |
| Sleeter item ($200 less $20) ............... | 180 | 00 |
| Interest ............................ | 35 | 85 |
| Orton item ........................... | 200 | 00 |
| Interest ............................ | 26 | 57 |
| Michael Hayes item ..................... | 612 | 50 |
| Interest ............................ | 191 | 17 |

Total to be applied as of May 15, 1902... $3,741 81

The defendant is also entitled to credit for subsequent payment of collateral, as follows:

| | | |
|---|---:|---:|
| Hanson item November 1, 1902.............. | $ 120 | 00 |
| Hanson item February 1, 1903............. | 120 | 00 |

The allowance of these credits shows an overpayment of the note by $1.77, taking into consideration a certain payment made thereon before suit by defendant."

Turning our attention to the evidence relating to these items, we are not able to agree with the conclusions of the trial court, and we will discuss such evidence sufficiently to indicate the reasons for our conclusions.

I. We will give our first attention to the largest item, which is the Michael Hayes item of $612.50 principal, and $191.17 of interest. This was a part of the collateral that was put up in 1897 to secure the first $4,000 note referred

to. At that time the defendant put up as collateral three
notes, signed by Michael Hayes. Two of them
were for $1,112.50 each, and the third was
for $612.50. They were included in the
list of collateral in the first receipt issued.
It appears from the evidence that these notes were all
sold to Lot Thomas, and an indorsement of that fact was
made upon the receipt held by the defendant. The method
of such indorsement was that the bank wrote in red ink
across the face of that part of the receipt which described
the notes in question the following: "These three notes
delivered and sold to Lot Thomas, and $2,000.00 received
as part proceeds, $1,000.00 indorsed on note, $1,000.00 to
credit on account." This receipt with this red ink indorse-
ment thereon had been in the possession of the defendant
from 1897 up to the date of trial. The contention of the
defendant is that such indorsement only accounts for $2,000,
"part proceeds" of the collateral, and the trial court sus-
tained this view. It is untenable. Stress is laid upon the
words "part proceeds," and it is urged that they contain
an implication that it was only a partial accounting. This
was not a receipt to Lot Thomas, but it was a receipt to
the defendant, and it receipted for $2,000, and no more.
It described such $2,000 as part proceeds of the Michael
Hayes notes sold to Lot Thomas. The red ink indorsement
was a clear cancellation of that part of the collateral receipt
which charged the bank with the possession of these notes,
and was a substitution therefore of a receipt for $2,000
of money. The defendant himself testified on this subject
that he knew the notes were sold to Thomas. "Don't recol-
lect whether the bank or myself sold the notes to Thomas.
I may have sold them. Don't recollect particularly in re-
gard to it. I will neither affirm or deny that I participated
in the negotiations. May have done so. I understand that
the two notes aggregating about $2,000 that were sold to
Thomas were accounted for as between me and the bank.

*1. PLEDGES: sale of pledged property: accounting: evidence: burden of proof.*

They were either sold by the bank with my knowledge and consent, or I sold them to Thomas. I will not say that I didn't collect the money on the $612.50 note of Michael Hayes, myself. I don't recollect."

When it is further considered that these notes never again appeared in any subsequent "summing up" list, and that the plaintiff's bank book was balanced at stated times and delivered to him throughout the subsequent years, and that his canceled notes were delivered to him when paid, and that they necessarily showed what payments had been indorsed thereon, it seems to us abundant proof that the bank did account at that time for the Hayes notes. If it had not done so, it is not probable that it could have escaped the defendant's attention; nor could he so easily fail to "recollect" a circumstance of such great importance to him. The facts here shown are sufficient to justify the inference of an accounting at that time. The bank, having once accounted, is not bound to assume the burden of a second accounting. If there was any mistake in the first accounting, the burden was on the defendant to show it. No formality is required in complying with the duty of an accounting. The defendant knew of the sale of the notes to Thomas and knew at the time that the notes were delivered to Thomas, and consented to it, and knew what was received for them. No other fair inference can arise but that he knew at that time what was done with the money. The fact that he has forgotten it now does not enlarge the liability of the bank. We are concerned at this point, not so much with the question of what was done with the money, as we are with the question whether the defendant at the time knew what was done with it. If he knew it and acquiesced in it, then the burden of attack is upon him now. There is no claim urged that he ever protested or disagreed in any way with the disposition of this collateral, or the proceeds thereof, and this remark is applicable to every item now in dispute before us.

There is a further circumstance of some presumptive significance. The $4,000 note signed by the defendant, for which the Hayes notes were held as collateral, was due June 25, 1897. In the absence of evidence to the contrary, we must presume that it was paid when due. Such payment would release all collateral. The receipt given for this collateral does not purport to hold it for any other debt, nor is there any evidence that the defendant at that time owed the bank any other debt. The cancelled note, when surrendered, carried into defendant's possession the only written evidence of the indorsements thereon. No other inference ought to be indulged in now, in the absence of contrary evidence, than that a settlement of the note by the defendant involved a knowledge by him of the payments indorsed thereon and the sources of such payments. Such settlement involved a release of the collateral. The defendant was in a position at least to know whether the collateral was then properly accounted for. Having made no protest then nor since, we see no reason why an inference of fact should not arise that he had full information at that time. If so, that was an accounting. These remarks are applicable, also, to the George Egerer and L. M. Miller items. These were included in the same receipt for collateral, and neither of them ever again appeared in any subsequent receipt.

II.   The next item in point of time is the Grosenbaugh item of $320 principal, and $75.72 of interest. It appears that on July 15, 1897, the defendant executed his note to

2. SAME: evidence.

the bank for $500, and put up as collateral certain leases. The bank issued its receipt for the collateral, as follows: "Received of E. R. Sisson the following leases made by E. R. Sisson to the following parties on land described in said leases, namely: . . . and one to Ed Grosenbaugh of Mendota, La Salle County, Ill. . . ." We infer from the record that this lease covered land near Mendota, although this fact does not clearly ap-

pear. The defendant testified that Grosenbaugh was never at Storm Lake, and there is no claim that the bank officers ever came in personal contact with him. It is evident that the recitals of the receipt are not sufficient to render the bank liable for the amount allowed by the trial court. On this item therefore the defendant assumed the burden. He testified in chief that the "value" of the lease was $320. On cross-examination he testified: "My impression is that the land leased was eighty acres at $4 an acre. I think it was payable in the fall. My impression is that the bank collected it. I do not know anything about it. I think I didn't collect it myself. Q. Will you swear that you didn't collect it yourself at Mendota from Grosenbaugh? A. If I did, I turned the proceeds to the bank. Q. Don't you recollect that you did collect it? A. My impression is that I didn't. Q. Will you say that you didn't? A. That is my impression. I have no recollection of collecting it. My impression is that it was paid. . . . I do not know anything about it, positively. Q. And you wouldn't say that you didn't collect it yourself? A. I give it as my impression that I didn't. He has never been in this country, as far as I know. I could not say whether I paid or renewed the $500 note to which these items were collateral. Q. How much did you collect on the collateral that you deposited in the bank which you took out and got the money on? A. I don't know that I collected it. I don't know that I got any. I would think the lease was worth about $400. . . . My impression is that the proceeds were collected and turned in the bank. *If they were, I got credit for it.* I haven't got anything to show where I got credit, unless it would be my bank book, and I wouldn't know as to that, because that don't particularly tell. Regardless of that fact, I am willing to waive the $400." The $500 note was in fact taken up in the fall of 1897. Much of what we have already said of the Hayes item is applicable here. Regardless of all that,

however, this item was established, if at all, by the quoted testimony of the defendant. In the face of the surrounding circumstances, it was too indefinite and unsatisfactory to base such an allowance upon. When it is further considered that the witness had, on cross-examination, finally conceded his "impression" that "the proceeds were collected and turned in the bank. If they were, I got credit for it"—and later in the cross-examination expressed himself willing to waive the item, this ought to have eliminated this item from further consideration.

III. The court allowed the Sleeter item of $180 principal, and $35.85 interest. This appears to have been a lease for the season of 1898, and calling for a rental of $200. It does not appear for what particular debt it was held as collateral. Defendant testified concerning this item as follows: "William P. Sleeter is dead. He gave me a lease. My impression is that the bank collected the money. Don't think I collected it. . . . I have no recollection of collecting the money. My impression is that the bank had it and collected it. I have no recollection of Mrs. Sleeter paying me that money after her husband died. I won't say she didn't. My persuasion is that she didn't. I don't think I got the money. If I collected it, I accounted to the bank for it. I might have done it, as 'I stated at the outset. I won't say that I didn't collect it. I may have collected it, and I may not. I wouldn't say whether I did or not." Later the defendant was confronted with a receipt signed by himself, as follows: "January 20, 1899. Received from Mrs. W. P. Sleeter, $20.00, the balance of rent on eighty acres leased, in full, being on N. ½ N. E. ¼ 27-91-37. E. R. Sisson." Thereupon the defendant admitted his signature, and conceded the collection of the $20, and testified further, as follows: "I have no recollection of her paying me $80 more. If she did, I don't recall it. . . . I may have collected it all. I give

my impression that I didn't collect the balance." Upon the strength of this receipt, the trial court deducted $20 from the $200 item, and allowed $180, instead of $200. We note from the record that the stipulated rent of $200 was not due until March 1, 1899. It was therefore all paid before due. The trial court treated this receipt as evidence of the payment of $20 to the defendant, and nothing more; but its probative value was greater than that. It showed upon its face that it was a full settlement of the balance due. It implied knowledge on the part of the defendant that he knew what amount had been previously paid; otherwise he could not have known the amount of the balance due. More than this, it traced the collateral into the hands of the defendant. He himself surrendered it to the maker. The failure of the bank therefore now to produce the collateral is accounted for. It is upon failure to produce that the presumptive liability rests. There is no claim of negligence in this case. This item never again appeared in any subsequent receipt, nor does it appear that there was ever any disagreement or protest in relation thereto. Upon this state of the evidence the allowance of this item was not justified.

IV. The court allowed the Anderson item of $150 principal, and $13.60 of interest. This item appears to have been a note for $150 given in 1899, and included in a collateral receipt under date of May 14, 1900. Anderson was a man who did much work for the defendant, and to whom the defendant had been indebted. They finally had a settlement. The defendant testified in chief as follows; "My impression is that he did some livery work for me, which may have been intended to apply on this and may have been absorbed in this way, so I will have to state that I am not certain whether I have had proper accounting for this or not." On cross-examination he testified: "It may have been paid di-

rectly to me by work. It may have been paid to the bank." Anderson was produced as a witness and testified that he did not remember that he ever gave the defendant a note for $150, nor that he ever paid such note to the bank. "I worked for him. Had various deals with Mr. Sisson. He owed me some years back. Had a great deal of business with him. Finally settled up with him. He owed me a good deal of money for different things. He paid me for my driving." This item did not appear in any of the subsequent receipts between the parties. Keeping in mind the free hand which the bank permitted the defendant to have with his collateral in withdrawing the same, and in dealing with the makers, we see no room for reasonable doubt under this evidence that the bank never collected the Anderson note, and that the debt represented by it was included in the settlement between Anderson and the defendant.

V. The Bauman items were allowed in the sum of $425 principal, and $67.13 interest. This was an executory land contract, calling for the payment of two installments of $225 and $200. As we understand the record, the defendant was required to convey to these parties certain real estate in pursuance of such contract. From the nature of the case therefore the bank could not have exclusive control of such collateral. It could only act in co-operation with the defendant, and the testimony clearly shows that the defendant did participate in the final closing up of the transaction. Going somewhat into the details of the evidence, at this point, it appears that Bauman and one Zimmerman were brothers-in-law, who came to Storm Lake from Mendota, Ill., and both purchased real estate from the defendant by contract. Both of these contracts were put up by the defendant as collateral to the bank, at the same time, and were included in the same receipt. In his testimony in chief the defendant undertook to charge the bank with liability for

the collection of both these contracts. Later it was made to appear by indisputable testimony that he had received the Zimmerman collateral on March 11, 1901, and claim for that item was abandoned. As to the Bauman contract, it is made to appear that the defendant conveyed the land contracted for to Bauman on February 1, 1901. On cross-examination the defendant testified: "He (Bauman) may have paid me the proceeds of that note. Won't say that he didn't. I 'think they acquired title from me. Certainly I knew it had been settled with someone before I deeded it to Bauman. My impression is, having the collateral receipt, that the bank got the proceeds of it. . . . Don't know whether I got credit or not." Later he testified as follows: "I have no recollection that I took the money from Bauman and made out the deed myself. I have no impression about it. I presume Bauman wouldn't have paid his notes to me nor to the bank without having his deed. I don't recollect that I left a deed at the bank. I will not swear anything about it. I won't say anything in regard to my knowing that he had paid his notes, and that I had got the proceeds before I had delivered the deed to him in February, '01. I wouldn't say it is not true. It may be, and may not be. Don't know whether it is or not. If I got the money, it was accounted for at the bank. I will not swear that I did not settle with Bauman, and executed my deed to him myself, in February, 1901." This item did not again appear in the later "summing up" receipt. The only fair conclusion to be drawn from the circumstance here shown, and from the testimony of the defendant in relation thereto, is that he participated in the final settlement, and was in a position to know what was done. The contract and notes were necessarily surrendered to Bauman with the knowledge and consent of the defendant. It is not essential that we know now what was done with the proceeds. It is enough to know that the defendant acquiesced

in what was done, and raised no question at any time concerning it, until he had so thoroughly forgotten it that he is unable to furnish the court any information concerning the transaction in which he confessedly participated. Knowing that the money was paid in, his self-interest would prompt him to see that he got proper credit for it, and the court must draw fair inferences in that direction. Assuming that the money was paid into the bank, there were only two ways in which it could apply it. It must indorse the same upon his note, if any; or it must place the same to the credit of defendant's personal account. His bank book was posted every month. His canceled notes carried all indorsements. He has offered none of them in evidence. The evidence convinces us that the defendant has no just claim against the bank on this item.

VI. The Graves item was allowed in the sum of $133.33 principal, and $14.02 of interest. This also was an executory land contract, calling for the payment of the amount indicated. It was dated August 11, 1900, and due July, 1902. Graves lived at Mendota, Ill. The testimony of the defendant on this item is very inconsistent, and it seems to us to be lacking in candor. He first testified as follows: "Think it has been paid at the bank, and got the deed. It was for a lot. I deeded the lot afterwards. The deed was put in the bank, but the money wasn't paid to me directly." Later he testified: "My recollection is that the bank came to me and asked for the deed. Stated to me that Mr. Graves was ready to pay the balance due when he got his deed, and that I made the deed and delivered it to the bank for consummation. I may be mistaken. That is my impression." Again he testified: "Graves wanted time, and Momeny came out and said that Graves was ready when he had his deed, and, I don't know, Momeny may have taken the deed back (to Mendota) for him, and the matter might

have been consummated through him. The impression I would have, if I could relate the order of it, is that I made out the deed and delivered it over to the bank." Thereupon the plaintiff offered in evidence the deed record of Buena Vista County, and this disclosed that the deed in question was signed by the defendant under date of March 19, 1904, and was acknowledged on March 21, 1904, and recorded on the same day. This was more than two months after the bank had gone into the hands of a receiver. The receiver testified that he had nothing to do with the Graves transaction, and knew nothing about it. To this testimony the defendant made no response. It is clear therefrom that the bank had nothing to do with the closing up of this transaction, and that the defendant did it himself. This was a tracing of the collateral into the hands of the defendant, at a time after the bank had ceased to do business.

VII. The last items in point of time are the Hanson items of $120 each. These were installments of rent due on a lease for the year 1902 on land in Dickinson County. These appeared in a collateral receipt under date of May 6, 1902. In the same receipt appeared another lease to one Ole Quee for land also in Dickinson County. It does not appear that the bank officers had any acquaintance or came in contact with these renters. In his testimony in chief the defendant charged the bank with liability for both these items. On the face of the receipt the bank was chargeable with both of these items. Quee, however, was produced as a witness by the plaintiff, and the defendant thereupon abandoned his claim of liability on the Quee lease. Hanson had moved several years ago to Canada, and was not produced. The defendant testified concerning Hanson: "I have no recollection of his paying rent to me. Q. Do you deny that he did? A. It is my impression that he didn't pay me. Q. Do you know? A. I do not. I do not know where he is

now. My impression is that he went to Dakota or Canada a few years ago. Ole Quee leased the land adjoining the Hanson land. I leased it to him, I think. I make no statement either way as to whether I got the money myself." The Hanson lease never left the hands of the bank. The cashier of the bank testified that they never received any part of the rent thereunder. Under the circumstances shown, we see no reason for doubting this testimony of the cashier. Confessedly the defendant collected the rent on the Quee lease, notwithstanding that it was held as collateral by the bank. Hanson and Quee farmed adjoining lands. No reason appears from the record why he should collect from the one and neglect the other. Nor does it seem credible that he could permit the departure of Hanson for Canada without concerning himself on the question whether the rent was paid. If Hanson did depart for Canada without paying his rent, it is not easily credible that the defendant could become so completely forgetful of the fact. This circumstance of itself tends to show that he knew the rent was paid. If he knew that it was paid to the bank, he was in a position to know that it had been converted, because he received no credit for it. He does not appear to have ever made such a claim to the bank. He does not make it now in his testimony.

It appears also from the evidence that the defendant executed in the year 1903 at least two notes to the bank at different dates. Each of these created a presumption against any known matured liability of the bank to him. These circumstances therefore abundantly corroborate the testimony of the cashier. We can not take time or space to discuss all of these items in detail. None of them, except the Hanson and the Graves items, which we have already discussed, appear in the final "summing up" receipt dated June 9, 1902.

We have gone through the evidence bearing on each

item with care, and we are unable to sustain the finding of the trial court on any one of them. The testimony of the defendant on the whole case does not make a favorable impression upon us. There were many other items for which he contended, and which the court properly disallowed, and many others for which he first contended and then abandoned upon being confronted by testimony. Such testimony usually related to transactions personal with himself, which he claimed to have forgotten. It is difficult for us to believe that a person of his apparent business experience and ability could forget so much of important business transactions. The defendant has apparently relied upon legal presumption for the success of his case, and has been concerned that his own testimony should not interfere with the free course of such presumption.

The briefs contain much discussion on the subject of the burden of proof. We do not find it necessary to go into the question. For the purpose of our conclusion, we have presumed, as contended by the defendant, that the burden was upon the plaintiff to account for all the collateral received by it since the year 1897, although we have grave doubt whether such burden should extend any further back than the collateral included in the last "summing up" receipt. It should be borne in mind, however, in applying such rule of legal presumption, that it may often be overcome by proper inferences of fact from the circumstances disclosed by the evidence.

Taking the case as a whole, we can not avoid the conviction that the defendant has not been candid in his counterclaim, and that he has not given the court the benefit of his actual knowledge and candid recollection of the transactions inquired about. The plaintiff, as transferee of the note, had no knowledge of any of the transactions inquired into. The president of the bank with whom many

3. SAME: burden of proof; application of rule.

of the transactions were had was in the penitentiary, as we infer from the record. His presence therefore at the trial was not available to plaintiff. In his answer and cross-bill the defendant did not set out the items of collateral upon which he based his claim of liability of the bank, but he averred under oath that he was not able to do so. It appears by his testimony, however, that he had at that time in his possession the seven receipts which he put in evidence, which contain all the items. Before the trial, and while the pleadings were in this condition, the plaintiff took the deposition of the president of the defunct bank in advance of the trial, but had no opportunity to examine him with reference to the specific items, which were disclosed by the seven receipts. The defendant testified orally at the trial before a referee, and produced these receipts in connection with his testimony. Some stress is laid in argument for the defendant because some of his testimony was undisputed by the president of the bank. In view of the method of pleading adopted by him, we do not feel at liberty to give undue weight to this fact. The intent of the rule as to presumptions and burden of proof, in cases of this kind, is the attainment of justice. It is not intended as a cover for indirection, nor is it intended to relieve a party from candid disclosure of material facts within his personal knowledge, nor will it permit a party to make an asset out of a bad memory, nor to make his case by complete forgetfulness of facts which were once within his knowledge.

As to each item under consideration, the circumstances are sufficient to show that the defendant knew at the time what was done. The very fact that he has since completely forgotten the facts and what he himself had to do with them is itself a circumstance tending to show acquiescence and satisfaction on his part at the time. He would not be likely to forget a dispute or a pending claim.

It is our conclusion, upon the whole record, that the

defendant is entitled to none of the items allowed, and the decree below must be reversed. It appears from the record that some collections were made, and are held by agreement pending the result herein. In view of that fact, the case will be remanded to the court below for a decree in harmony herewith.—*Reversed* and *remanded*.