STATE BANK OF PRAIRIE CITY, Appellee, v. E. C. COOPER, Appellant.

**ACCOUNT STATED: Pleading—Burden of Proof.** A bank which furnishes its customer periodical statements of the condition of his debits and credits which are acquiesced in by the long silence of the customer, is under no burden of proof to disprove the subsequent claim of the customer that certain specified items of the account were incorrect. *The burden rests on the customer to establish his allegation of incorrectness.*

**PRINCIPAL AND AGENT: Liability As to Third Persons—Declarations of Agent.** Principle recognized that a principal is not bound by the independent admissions of an agent *after the event.*

Headnote 1: 1 C. J. p. 720. Headnote 2: 22 C. J. p. 379.

*Appeal from Jasper District Court.*—D. W. HAMILTON, Judge.

OCTOBER 20, 1925.·

REHEARING DENIED JANUARY 22, 1926.

ACTION at law upon promissory notes and upon an overdraft account.  The defense interposed is a counterclaim for the alleged conversion of defendant's funds by the plaintiff, such conversion extending over a period of many years.  The amount so converted is alleged to be $25,000.  Specific items are set forth, amounting to the sum of about $15,000.  The plaintiff replied with a general denial and a plea of settlement and a plea of the statute of limitations.  At the close of all the evidence, the trial court directed a dismissal of the counterclaim and a verdict for the plaintiff for the amount of its notes and overdraft.  The defendant has appealed.—*Affirmed.*

*Campbell & Campbell* and *Thomas J. Bray,* for appellant.
*Korf & Korf* and *Cross & Hamill,* for appellee.

EVANS, J.—I.  This action was begun in March, 1923.  For ten years prior to such time, the defendant had been a regular customer at the bank. ·He was engaged in farming.  As a part

1. ACCOUNT STATED: pleading: burden of proof.

of his farming operations, he engaged in the business of stock feeding on a large scale.  He bought and sold annually large numbers of cattle.  He was at all times a heavy borrower at the plaintiff-bank, and at all times maintained an account there.  Very many notes were executed by him, either for borrowed money or for renewals of notes falling due.  His checks were myriad in number.  Checks were drawn on his account by himself, by his wife, by his son, and by his manager (Reed).  He had a pass book, which was balanced periodically by the bank and returned to him, together with his canceled checks and an itemized adding machine list, showing the amount of each check and the sum total of all.  The notes and the overdraft sued on by the plaintiff represent the tail end of the business transacted between the parties.  In January, 1923, the defendant refused to pay or to

renew his notes then falling due, being the notes in suit. He declared his conviction at that time that he had been robbed by the plaintiff-bank, and he demanded an audit of the plaintiff's books. Such audit was allowed to him. He employed an accountant for that purpose, who was given access to all of plaintiff's books and records which were then available. Checks and notes were furnished to him by the defendant. The accountant made a report which declared his inability to locate or to discover upon plaintiff's books the evidence of certain specific items named in his report. The counterclaim is predicated upon the items thus specified in such report. The items thus specified appear in the record under three heads, marked respectively "A," "B," and "C." Under "A," ten items are listed, making a total of $9,188; under "B," one item, of $6,175; under "C," thirty-four items, amounting to $3,019. The accountant testified in support of his report. Upon the trial this report proved to be very inaccurate and virtually without value. This was not necessarily the fault of the accountant. His report purported to show only what he had found and what he had failed to find upon the books of the plaintiff. Some data were unavailable to him. He did not have all the canceled notes and checks of his client, because these had not all been preserved. He did not have access to all the records of the bank, because the earlier records had passed into the discard, and into the basement and furnace rooms. It appears that certain of the bank's books lost their usefulness after two or three years, and were customarily stowed away in the basement, without any active intention to preserve them. The janitor had access to them. Virtually all the items of importance which are specified in the report bear dates from 1913 to 1919. Not all the data available to the accountant was examined by him. This is true of the daily balance sheets, which were omitted from his examination, as his report shows. Nor does it appear whether or not he examined the pass books of the defendant. The inaccuracy of this report is well indicated by the fact that on this appeal the defendant, as appellant, relinquishes all claim to any of the thirty-four items in Division C. Other important items are still claimed, and are so claimed solely upon the strength of this report.

Appellant has tried his case, both below and here, on the apparent theory that, by his specification of items claimed, he has thereby cast upon the plaintiff the burden of accounting and disproof. This is an erroneous view, and upon this record is of itself quite fatal to the appellant. For ten years the plaintiff has been rendering an accounting to the defendant periodically, and at the times when the transactions involved were recent and fresh in the recollection of the parties. When the bank balanced the defendant's pass book and returned it to him with his canceled checks, that was an accounting of the most satisfactory kind. It was the duty, as well as the self-interest, of the defendant to examine such account and to protest it with reasonable promptness, if erroneous. In the absence of protest within a reasonable time, the accounting became a settlement. *Benton County Bank v. Walker*, 85 Iowa 728; *Des Moines Nat. Bank v. Sisson*, 143 Iowa 191. The last cited case bears much analogy to the case at bar. We held therein that, when a bank has once rendered to its customer a full accounting, which has been acquiesced in without protest, it is under no burden of accounting again. This is the situation here. The time to protest the accounting of 1918 was *then*, and not five years thereafter. The propriety of this rule will become more apparent in the further consideration of this record. Granted, therefore, that the previous accounting by the bank is still open to attack on the ground that fraud had been concealed therein, yet the burden of such attack rests upon the defendant. It is incumbent upon him to point out the items, and to prove the fraud or wrongful conduct involved. Turning to the evidence of the defendant as a witness, we find no testimony in his direct examination which refers in any manner to any of the items in his counterclaim. The only reference in his testimony to any of these items is to be found in his cross-examination, of which the following is sufficiently illustrative:

"Q. I will go over this in detail with you, if that is the only way. I will ask you whether or not, on October 27, 1919, you issued a check, Ex. A-36 Hamilton, to Jenks & Son for $5.00, which was stamped paid October 28, 1919, by the State Bank of Prairie City. A. I do not recall issuing that check.

Q.  Well, the check is before you, and I ask you to examine it and tell the jury whether or not you wrote that check.  A.  I do not know whether I wrote that check or not.  Q.  Do you know of a living soul on the face of this earth who can tell the jury whether or not you wrote that check?  A.  Some handwriting expert might.  Q.  But you cannot?  A.  I cannot.  Q. Is that writing in the body of the check—October 27, Jenks & Son, Five and no-100—your writing?  A.  I do not know whether they are or not.  Q.  Who are Jenks & Son?  A.  Hardware store at Prairie City.  Q.  You traded there?  A.  Yes, sir. Q.  I will ask you to examine the three checks marked, dated May 1, 1917, for $8.55, signed 'E. C. Cooper,' and paid May 9, 1917, marked Ex. A-39 Hamilton; and the check dated May 8, 1917, to the Standard Oil Company for $14.42, stamped paid May 9, 1917, and signed 'E. C. Cooper,' marked Ex. A-37 Hamilton; and the check dated May 4, 1917, for $15, payable to E. C. Williams, signed by E. C. Cooper, marked Ex. A-38 Hamilton, the three checks aggregating $37.90,—and ask you to tell the jury whether or not you wrote those checks.  A.  I do not know whether I wrote those checks or not.  Q.  Is that your signature on Exs. A-37, A-38, and A-39 Hamilton?  A.  I do not know whether I wrote those or not.  Q.  What does W. O. W. on Ex. A-39 Hamilton stand for?  A.  Woodmen of the World. Q.  Were you a member of the Woodmen of the World at that time?  A.  What is the date?  Q.  May 1, 1917.  A.  I think so.  Q.  And did you owe $8.55 in dues at that time?  A.  What is the date?  Q.  May, 1917.  A.  I paid my dues quarterly. Q.  How much were they by the quarter?  A.  About $8.55. Q.  About $8.55, and that check was given for your dues in the Woodmen of the World?  A.  I do not know.  Q.  Would you say that it was not?  A.  I do not know whether it was, or whether there is another signature like it.  I do not know whether or not that check came from me.  I might have, and I might not have, and you might have made it.  Q.  Would you swear you didn't make that check?  A.  I wouldn't swear I did make it.  Q.  Will you swear you didn't make it?  A.  No. I would not.  Q.  Let's see: this Ex. A-37 Hamilton to the Standard Oil Company is for $14.42,—did you write that check?  A.  I do not know.  Q.  Do you know whether or not

that is your check? A. I do not know. Q. You see that green pen check near the tail end of the signature there? A. Yes, I do. Q. When Mr. Becker was examining the checks, did you ever see him have that kind of a check mark on it? A. I know he checked with green ink,—whether like that I do not know. Q. Were you doing business with the Standard Oil Company about May 8, 1917? A. Have done business with them right along. Q. Purchased stuff of them and paid them by checks on the State Bank of Prairie City? A. I do not remember when I started, and do not know when I quit; have not quit yet. Q. Do you know E. C. Williams? A. Yes. Q. Where does he live? A. East of Monroe, now. Q. Did he use to live around Prairie City? A. Yes. Q. Were you doing any business with him about May 4, 1917? A. I do not recollect the date. Q. Were you doing business with him about that time? A. I have done business with him,—do not recollect the date. Q. I want you to examine Ex. A-38 Hamilton, a check dated May 4, 1917, payable to E. C. Williams for $15, and signed 'E. C. Cooper,' and tell the jury whether or not you wrote .that check. A. I do not know. Q. Would you say that you did not? A. I wouldn't say whether I did or did not. Q. Do you mean to tell the jury that you do not know your signature to checks or notes or documents of importance? A. I can read my name; I do not know that a fellow cannot imitate it. Q. Examine Ex. A-40 Hamilton, and state whether or not you wrote that check for $15 to W. E. Roush. A. I do not recollect it. Q. Is that your signature? A. I do not know; it looks like mine. Q. You see a green pen check on that? A. Yes. Q. And examine Ex. A-41 Hamilton, being a check dated August 19th, payable to D. G. Churchill for $10, and signed by E. C. Cooper,—is that your signature? A. I do not know. Q. Did you write a check like that for them some time? A. For Mr. Churchill? Q. Did you do anything about that time? A. I do not know. Q. Pay him $10 about that time? A. The year isn't on it. Q. It is stamped paid in 1920. A. I do not recollect it. Q. But you were doing business with G. D. Churchill? A. I have done business with him. Q. Do you know a fellow by the name of Ed Long? A. Yes, sir. Q. Did you give him a check for $75 on August 20, 1920? A. I

do not recollect the date.  Q.  Ed Long worked for you at that time?  A.  Yes.  Q.  You gave him $75 a month?  A.  Yes. Q.  You gave him a check about that time for a month's wages? A.  I do not remember the date.  Q.  Did you give him a check for a month's wages?  A.  Yes.  Q.  Did you ever give him a check for $75?  A.  Yes.  Q.  Is that a check you gave him for $75?  A.  I do not know.  Q.  Those three checks for $15 and $10 and $75,—that is the $100 item that you complain about, that you say was improperly charged to your account?  A.  I do not know.''

The foregoing noncommittal answers reflect the attitude of the defendant with reference to the items claimed.  The result is that the defendant offered no affirmative evidence in support of his claim of conversion of any particular item.  His argument here is predicated wholly upon the alleged insufficiency of the plaintiff's present accounting.  He did not put in evidence even his pass book or the balances periodically furnished him by the plaintiff.  This state of the record is of itself fatal to the defendant, and would have been so if the plaintiff had remained as silent as he, upon the items of the counterclaim. The plaintiff, however, did put in evidence its books and records, which disclosed every item involved in the suit save one, and gave full explanation of the circumstances attending them.  The defendant did not, in rebuttal, venture to deny any of this testimony.  There was one note of $500, which the plaintiff has not been able to locate upon its records, nor was the plaintiff's cashier able to recollect the circumstances attending its execution.  It appears also that, in the course of dealing between the parties, renewal notes were taken for the principal sum, and a separate note was taken for the interest, and that the interest note was never entered upon the books to the credit of the defendant.  This was so because he stood charged on their books only with the principal sum.  The fact that he had signed the note was a sufficient proof of its genuineness and of its consideration.  The subsequent balancing of his pass book was sufficient presumptive evidence that he had received all the credits to which he was entitled.  Upon the record before us, not only has the defendant failed wholly to prove any items, but the plaintiff has introduced affirmative proof to the contrary, per-

suasive enough to remove all doubt from any reasonable mind as to the want of merit in this counterclaim. The following excerpts from *Des Moines Nat. Bank v. Sisson,* 143 Iowa 191, 198, 204, 209, are quite pertinent to the record before us:

"The bank, having once accounted, is not bound to assume the burden of a second accounting. If there was any mistake in the first accounting, the burden was on the defendant to show it. No formality is required in complying with the duty of an accounting. The defendant knew of the sale of the notes to Thomas, and knew at the time that the notes were delivered to Thomas, and consented to it, and knew what was received for them. No other fair inference can arise but that he knew at that time what was done with the money. The fact that he has forgotten it now does not enlarge the liability of the bank. We are concerned at this point, not so much with the question of what was done with the money, as we are with the question whether the defendant at the time knew what was done with it. If he knew it and acquiesced in it, then the burden of attack is upon him now. * * * The only fair conclusion to be drawn from the circumstance here shown, and from the testimony of the defendant in relation thereto, is that he participated in the final settlement, and was in a position to know what was done. The contract and notes were necessarily surrendered to Bauman with the knowledge and consent of the defendant. It is not essential that we know now what was done with the proceeds. It is enough to know that the defendant acquiesced in what was done, and raised no question at any time concerning it, until he had so thoroughly forgotten it that he is unable to furnish the court any information concerning the transaction in which he confessedly participated. Knowing that the money was paid in, his self-interest would prompt him to see that he got proper credit for it, and the court must draw fair inferences in that direction. Assuming that the money was paid into the bank, there were only two ways in which it could apply it. It must indorse the same upon his note, if any; or it must place the same to the credit of defendant's personal account. His bank book was posted every month. His canceled notes carried all indorsements. He has offered none of them in evidence. * * * As to each item under considera-

tion, the circumstances are sufficient to show that the defendant knew at the time what was done. The very fact that he has since completely forgotten the facts and what he himself had to do with them is itself a circumstance tending to show acquiescence and satisfaction on his part at the time. He would not be likely to forget a dispute or a pending claim."

The following excerpts from the same case are strikingly descriptive of the attitude of the defendant herein:

(Page 208) "The testimony of the defendant on the whole case does not make a favorable impression upon us. There were many other items for which he contended, and which the court properly disallowed, and many others for which he first contended and then abandoned upon being confronted by testimony. Such testimony usually related to transactions personal with himself, which he claimed to have forgotten. It is difficult for us to believe that a person of his apparent business experience and ability could forget so much of important business transactions. The defendant has apparently relied upon legal presumption for the success of his case, and has been concerned that his own testimony should not interfere with the free course of such presumption. * * * [Page 209] The intent of the rule as to presumptions and burden of proof, in cases of this kind, is the attainment of justice. It is not intended as a cover for indirection, nor is it intended to relieve a party from candid disclosure of material facts within his personal knowledge, nor will it permit a party to make an asset out of a bad memory, nor to make his case by complete forgetfulness of facts which were once within his knowledge."

Sufficient to say that the defendant gained nothing by his uncandid refusal to identify his own checks, or by the failure of his memory as to the transactions out of which they grew. The burden of the affirmative was upon him. He did not meet it.

II. The defendant, as a witness, testified to an alleged conversation with Buckley, the plaintiff's cashier, as follows:

"When I got back to the bank on Friday night, we came into the back room of the bank, and Buckley says to me: 'You know the other night when you told me you had trusted me

2. PRINCIPAL AND
AGENT: liability
as to third per-
sons: declara-
tions of agent.

further than you probably ever trusted any-body in your life, it kind of came back to me that there was something wrong back of some of this. I want to make a clean breast of the thing to you, and I want you to do the same to me.' He said: 'Could you keep a secret?' He said: 'I have been stealing off of you. I have robbed you and I have hurt you.' He says: 'You know the Bible says that you must repay two dollars for every dollar you take off of a man.' He says: 'I want to do that way with you. Do you know how much money I have got?' I said: 'I do not know.' He got the loose leaves of his ledger, and he showed me pretty well where he had taken $500 at a time. He showed me a place where there was a deposit of $1,500 and he gave me credit for $1,000. I saw the figures myself. It was a deposit in the form of a note. I says: 'Where did that other $500 go to?' He says: 'Well, it went to "bills receivable."' I says: 'Where from there?' He says: 'I finally got it.' Then he showed me another place a little later on, where another $500 was gone. I said: 'Where did that go to?' He says, 'Well, I have lost track. I don't know how much I did get.' He said he would give me the $1,000 loss on the cattle, and said he would give me the $500 on the liberty bonds, and would give me the $1,000 that he had taken off of me, and the interest, two dollars for one, making the total around $4,400. He says: 'I am not a crook at heart. I don't know why I done it; I didn't need the money. This is the first time I ever done this; this is the only time I have ever done this. It is me for the straight and narrow way from now on,'— and the tears rolled down his face. He said: 'I have a good father and a good mother and a good wife and boy.' That is the most of the conversation that took place that night. There might be something more I might recall later. That is the most of it. None of the notes were renewed there. He asked me to come back the next night. I agreed to come back, but I didn't.''

The date fixed for the foregoing conversation was in February, 1923. This testimony was wholly denied by Buckley. It is now argued that this evidence was sufficient to go to the jury on the question of liability to the defendant in some

amount. This alleged conversation was had, if at all, while Buckley was pressing the defendant for a renewal of his past-due notes, and while the defendant was refusing to renew. The defendant was at that time claiming two items from the plaintiff. The defendant was claiming of the plaintiff an item of $1,000 of damage in the shipment of some stock. The plaintiff had a mortgage on the stock for the purchase money, and its president had insisted that the shipment to Chicago should be made to a specified commission firm. The claim of defendant was that he lost approximately $1,000 through the fault of this commission firm, which was not of his choice. He also claimed $500 for which he had given the bank a note to cover loss on the sale of liberty bonds. It appears that, in a time of stress in 1921, the bank was insisting upon the payment of defendant's notes because of the stringency of the money market. It was finally arranged between them that the bank would sell its liberty bonds, which would result in a loss of $1,000 to the bank. The defendant assumed to pay one half of the loss, and executed his note therefor. These two items were conceded to the defendant by plaintiff, and were actually paid to him, as he himself admits; and yet, according to the foregoing conversation, they had been included in the confession of guilt, and were a part of the $2,200 for which twofold restitution was to be made. Whether the defendant is claiming $700 or $2,200 or $4,400 on the strength of this alleged confession is not disclosed in his argument. It is simply argued that the evidence was enough to go to the jury. What specific item of the counterclaim is supported by this evidence is not pointed out in argument. The counterclaim is in no manner predicated upon this offer of restitution. Counsel for appellant overlook the fact, also, that Buckley is not a party to this suit. The alleged admission by Buckley was no part of any transaction involved in this suit. The question here is not whether the admission is presumptive evidence of Buckley's liability, but whether it is evidence of the bank's liability. To what extent and under what circumstances the admissions of an agent are binding upon his principal is a question not considered in appellant's brief. The broad rule is that a principal is not bound by the independent admissions of an agent *after the event*. If there are exceptions

or qualifications to that rule which would apply to the case at bar, they are not brought to our attention. We hold that the evidence, such as it is, was not proof of any particular item in the counterclaim.

Because of our holding in the first division hereof, other questions argued need not be considered.

The judgment below is, accordingly, affirmed.—*Affirmed.*

FAVILLE, C. J., and ALBERT and MORLING, JJ., concur.