C. E. ERICKSON COMPANY, Appellee, v. IOWA NATIONAL BANK, Appellant.

No. 39908.

April 14, 1930.

Rehearing Denied December 13, 1930.

*Nourse & Nourse,* for appellant.

*Parrish, Cohen, Guthrie, Watters & Halloran,* for appellee.

Evans, J.—I.   Many of the facts involved herein are recited

and considered by us in the opinion in *State v. Cordaro,* 206 Iowa 347. Reference may be had thereto for many of the details omitted from our present recital.

The vital question in this case is whether the evidence in the record was sufficient to justify a directed verdict for the plaintiff. The evidence was sufficient to show forgeries of indorsements of checks, which were paid by the defendant and charged to the account of plaintiff; and  the showing in that respect was quite conclusive. The plaintiff thereby made a prima-facie case. The plaintiff was not required to prove negligence on the part of the defendant in failing to discover the forgeries, nor would it avail the defendant to show that it exercised due care in that respect. The duty of the defendant, as drawee, to pay the check *only* to a holder thereof under genuine indorsement, was quite absolute. Whatever degree of care was exercised, the drawee paid the check at its peril, nevertheless. While it is true, however, that no degree of care on its own part will avail the drawee as a defense, it is also true that he may show that he was deceived, misled, or induced to make the payment by the negligent acts of the plaintiff itself, through its authorized agents. This application of the rule of estoppel is recognized in the Negotiable Instruments Law, Section 9483, Code, 1927. It is upon this issue of plaintiff's contribution, through its own misleading acts, to the failure of the defendant to discover the spurious character of the indorsement that our discussion will be directed herein.

The plaintiff was a manufacturer of novelties in the city of Des Moines, and had a pay roll comprising from 119 to 150 persons. The checks involved in this litigation purported on their face to be pay-roll checks. They were, in fact, fictitious checks, fraudulently incorporated in the pay-roll list by Cordaro, one of the officials of the plaintiff.

The official force of the plaintiff-incorporation consisted of Erickson, president; Bridges, treasurer; Rice, office manager; and Cordaro, cost accountant and pay-roll clerk. These officials had their desks all in the same office. Cordaro, who had previously been a bookkeeper for the plaintiff, was promoted in March, 1923, to the position above named. His peculations began in July, 1923, and continued until his detection, in August, 1926.

498

Sometime prior to Cordaro's employment, the office manager had devised and put into effect a system of checks and balances and of accounting, under which the plaintiff was conducting its business, and especially the financial end thereof. Under this system, an account was kept with every workman. To each one was assigned a work card, a clock card, a record card, and a clock number. Every workman was required daily to fill out his work card, showing the number of hours of work for the day and the nature of the work. He was also required to "punch the clock," both on arrival and on leaving his work. From these data the record card was made up in the office. Pay day occurred twice each month. On the 17th day of each month, the pay roll was made up, and checks issued in payment for the first 15 days of the month. On the second day of the following month, payment was similarly made for the last half of the preceding month. The amount due each workman was computed from the work card and from the clock card, as tabulated in the record card. The correctness of a pay check could always be ascertained by reference to the cards, both as to the name of the payee and the amount of pay due. In order to carry out this system, it was apparently necessary to have a special arrangement with the bank on which the checks were to be drawn. For that purpose the plaintiff carried two accounts at the bank. One of them was known as the general account, the other as a pay-roll account. All deposits of funds were made in the general account. When the pay roll was made up, on a semimonthly date, its sum total was ascertained in the plaintiff's office. A check for this sum total was drawn by the treasurer, which was deposited in the pay-roll account. In no other manner were deposits made in the pay-roll account. Each pay-roll check was drawn so as to show on its face the details which connected it with the record cards. The following exhibit is a sufficient illustration of the form of the check:

"C. E. Erickson Company, Incorporated
"No. B. 13502
"Manufacturers of Advertising Specialties
"Des Moines, Iowa, July 2, 1925.
"Pay to the Order of Nora Shepard  -  -  #49, $32.49
"Exactly Thirty Two Dollars Forty Nine Cents
"Pay Roll Account

"To the Iowa National Bank,
"33-3 Des Moines, Iowa
          "C. E. Erickson Company, Inc.
          "By I. M. Bridges.
"Above Check endorsed as follows:
     "Nora Shepard
          "J. Cordaro."

Each check carried the clock number of the payee of the check. The words "Pay Roll Account" were written in red ink at the right-hand lower corner of each check. Each check was intended to advise the drawee-bank that it was issued in payment of the wages of the payee. Such, in a general way, was the system .in vogue in the office, which was extended also to the banking operations.

The evidence tends to show that Cordaro conceived the idea of padding the pay roll to his own benefit. In order to do so, he adapted his method to the system in vogue. The duties devolving upon him as pay-roll clerk were to make up the pay roll for the past half month and to prepare the checks for the purpose of payment. The checks were prepared by the use of an addressograph, and the name of each payee appeared in type. The checks thus prepared were presented to Bridges, the treasurer, for signature. For the period of three years, these checks were all signed by Bridges, as presented to him by Cordaro. The method of padding adopted by Cordaro was to draw check and to name therein as payee some former employee, who was not such at the time the check was drawn. Such check purported to show the usual details appearing upon all the pay-roll checks. The copy set forth above is sufficiently illustrative. The payee, Nora Shepard, had been previously an employee. Similar checks had been issued to her while she was an employee. The check thus drawn was spurious in the sense that nothing was due the payee, and she had nothing to do with the check. Nor had she a present clock number 49. In signing the pay-roll checks, Bridges did not distinguish between those that were genuine and those that were spurious. He signed all of them. The spurious checks could have been detected by Bridges by reference to the work cards and the clock cards, but no such reference was made. Upon the signing of the checks by Bridges, they were all delivered to Cordaro for distribution. In such distribution, some of them

were cashed by Cordaro, at the request of the payees. The spurious checks were indorsed in blank by him in the name of the payee. Underneath such indorsement he wrote his own name. They were presented by him at the bank for payment. Payment was made. This process was substantially repeated with the successive pay rolls. 72 pay rolls are involved. During the period covered by the investigation, 10,671 pay-roll checks were presented at the bank and paid. Of this number 479 are claimed by plaintiff to be spurious. Every month during that period, the drawee-bank balanced the account of the plaintiff, and returned statements thereof to the plaintiff, together with all the checks cashed. Every statement thus furnished by the bank carried a printed warning in bold type, calling upon the depositor to examine the account and to report errors, if any. It also announced that, unless errors were reported, the account would be deemed correct. The plaintiff apparently acquiesced in this printed warning, and assigned to Cordaro the duty to check the statement of the bank with the records of the corporation. Other than the assigning of this duty to Cordaro, no checking of the bank statement with the records of the plaintiff was made. The defendant introduced evidence to the effect that it carried insurance to cover such losses as are herein indicated, and that the protection of such insurance was lost to it by reason of delay in discovery. Such, in general, is the character of the evidence in this record. Is it sufficient to carry the issue of plaintiff's negligence and of its contribution to the defendant's mistake, either as a question of law to the court, or as a question of fact to the jury?

We have already referred to the duty of a drawee-bank to pay the checks of its depositor only to a proper holder, as an absolute one. This rule of liability is applicable strictly to the relation of depositor and depositary. Where the relation of depositor and depositary is modified or qualified by mutual understanding of the parties themselves, the rule of mutual obligation may be modified, also. By conduct and understanding, the parties themselves may create mutual obligations quite independently of the naked and strict rule of liability which would otherwise obtain. In such a case, the depositor may, by conduct or understanding, assume a duty to aid and protect the depositary, as such, and may estop himself from enforcing liability

against the depositary where his own failure of duty misled the depositary to his injury.

If, in this case, the plaintiff could be charged with full responsibility for the conduct of Cordaro, its cause of action would fail, under the foregoing rule. It is generally accepted, however, as a rule of law, that a principal is not chargeable with the fraudulent knowledge acquired by his agent in pursuit of a purpose by the agent to defraud his principal. Just why, in the application of this rule, it should be deemed logically necessary to shift the resulting injury from the principal to an innocent third party who deals with the agent within the scope of his authority is not readily apparent. In a qualified sense, such is the holding of the cases. It will be noted that the plaintiff was operating under a system of checks and balances, and such system extended from its offices to the bank counter where its checks were to be paid. The drawee-bank responded to the system, and relied upon it as mutually beneficial to the protection both of the corporation and of the drawee-bank. In assuming the methodical burden of the system, the drawee-bank was fairly entitled to its benefits. The larger purpose of the system was to prevent the very thing that actually happened. The wrongdoing of Cordaro was accomplished, not by the working of the system, but by the failure of the corporation to observe its requirements. These checks were spurious from the beginning. They never had a valid existence. The name of the payee was fictitious. This was a violation of the system. Its fictitious character could readily have been discovered in the corporation's office by reference to the cards. In signing these checks and delivering them to Cordaro for distribution to the payees and for presentation to the drawee, Bridges represented to the drawee-bank that they were actual pay-roll checks, and that the payees named therein were actual present employees of the corporation. It was a material misrepresentation, though not knowingly made as such. The drawee-bank was under the duty of knowing that the indorsement was genuine. In response to that duty, it exercised some degree of care to ascertain that fact. The greater the degree of care, the greater the protection afforded to itself. If the representation made by Bridges to the effect that the payee of the check was a present employee was fairly sufficient to satisfy the drawee-bank of the genuineness of the indorsement, and if it relied thereon in

the paying of the check, then negligence on the part of Bridges in making the representation without knowing its truth or falsity would operate as a defense herein. If the drawee-bank, in paying the check, reasonably believed that the payee was a present employee, it might also reasonably believe that the indorsement was genuine. In such event, the plaintiff would be chargeable with negligence in inducing the belief.

Up to this point, we have taken no account of the action of Cordaro. The plaintiff-corporation was not chargeable, under the authorities, with the guilty knowledge of Cordaro, which  knowledge had been acquired by him in his own interest, and in hostility to the interest of his principal. This does not mean that the principal-corporation may be absolved from responsibility for failure to make the investigation which Cordaro ought to have made in its behalf. If a duty rested on the corporation to verify the checks issued and to see that they were genuine on their face, and drawn to genuine payees, then the fraud of Cordaro in hostility to his principal would not excuse the principal from performing the duty which it delegated mistakenly to Cordaro. The rule in such a case is stated in *First Nat. Bank v. Farrell* (C. C. A.), 272 Fed. 371, as follows:

''Without weakening this general rule, other principles come into operation, according as circumstances vary its application, and according also as it responds to the test whether the failure of the depositor promptly to examine the bank's statements and apprise it of discovered errors, has misled the bank to its prejudice. These arise more frequently when an agent whom the depositor has authorized, as in this case, to examine and settle the account, has himself depleted the account by forged checks, altered checks, or checks drawn beyond the scope of his authority, as against which the bank has a right to be protected. Here, the depositor owes the bank the further duty of properly supervising the conduct of his agent in the examination of the bank's statements, especially where it appears that the agent committing the frauds had an interest in concealing them. * * * In such instances, the cases hold that knowledge of a dishonest agent of fraudulent entries and incorrect balance is equally the knowledge of his principal, with the qualification, however, that

the principal is chargeable, not with the knowledge of wrongdoing the agent possessed from the fact that he himself was dishonest, but with knowledge of such facts as an honest agent, unaware of the wrongdoing, would acquire when examining the statements, within the scope of his employment. The dishonesty of the agent does not change his relationship to his principal, and accordingly does not change the rule charging the principal with knowledge of such facts.''

While it is true in such a case that the principal is not affirmatively chargeable with the wrongdoing of its hostile agent, it is, nevertheless, chargeable with its own duty, which it had mistakenly delegated to the hostile agent. It may not rely upon the default of its false agent as an excuse for its own failure to perform the duty. The failure of performance of duty is chargeable to the principal, through whatever agency the failure results. If, in this case, the representations of fact made on the face of the checks by Bridges, as the signer thereof, might reasonably be relied upon by the drawee, and if, when so relied on, they reasonably tended to relax further investigation on the part of the drawee for its own protection, then they worked an estoppel against the plaintiff. The drawee might well be influenced by the apparent probability that the payee in a pay-roll check could not readily be deprived of his check without immediate discovery. It is also manifest upon this record that, if the payee in each check had been genuine, there would have been no false indorsement and no negotiation of the check. It is, therefore, apparent that the system devised and put in use by the plaintiff-corporation, and participated in and relied on by the drawee-bank, broke down in the very office of the corporation, not through any weakness of the system, but through the failure of the corporate officers to observe its requirements. The very protection that the system offered to the drawee-bank did thereby become a mere trap, into which the drawee-bank fell.

II. Was the plaintiff guilty of negligence contributing to the defendant's injury after the payment of the checks and after receipt of the bank statements? Monthly statements were

 furnished to the corporation, and these were accompanied with the original checks, which had been paid and canceled. The corporation was requested to examine the statements and the checks. It purported to do so. Clearly, it had some duties in this respect. It is to be said, however, that it was not primarily bound to discover forgery in the indorsements. Ordinarily, it had the right to presume that the indorsements had been verified by the drawee-bank. The general theory upon which this rule of law is predicated is that, ordinarily, the drawer of the check has no control over it after it leaves his hand, and has no means available for testing the genuineness of indorsements. This rule has special application to indorsements made after negotiation of the check by the payee. There may be circumstances whereby the drawer of a check would have knowledge imposing a duty upon him to impart information to the drawee. Suppose, for instance, the drawer should draw his check to his own wife. Suppose that the same should be stolen, and thereafter collected upon a forged indorsement, and this with the knowledge of the drawer. The check being returned to the drawer with the monthly statement, could he properly refrain from imparting knowledge of such facts with reasonable promptness to the drawee, who had paid the check? In the case at bar, the check was spurious in all its parts, except the signature of the treasurer. If the drawee had paid it to the payee, a fraud would have been accomplished thereby, and the loss to the plaintiff would have been the same. If the drawee had known that the name of the payee was fictitious, and that the person named was not a present employee, this knowledge would have stimulated further investigation by the drawee, for his own protection. Information of those facts would have been more valuable *before* than it would be *after* payment. But even the subsequent discovery would have operated to prevent future losses, and would also furnish a better present opportunity to recoup the loss already suffered than was available to the defendant at a later date. The case of *Pannonia Bldg. & L. Assn. v. West Side Trust Co.,* 93 N. J. Law 377 (108 Atl. 240), has much similarity at this point to the case at bar. In that case, as in this, the checks were regularly executed on their face, by proper officials, of which the

wrongdoer was one. The payee was fictitious. Quoting from the opinion:

"The principles enunciated in these cases, applied to the facts above enumerated, make it perfectly obvious that the plaintiff loan association was negligent in not examining its bank pass book when balanced and the vouchers returned therewith, which included the forged checks in question; for, had it done so by any one or more of its officers other than Szedlak, it would have discovered that all of these thirty-two checks had been ultimately paid to its treasurer individually, which fact alone would have put it upon inquiry which would have led unerringly to the detection of the fraud,—and this in the earliest stages of its perpetration. As it was, the acceptance of these balanced bank pass books from the defendant trust company many times during the period covered by the fraud, without protest or objection as to the forged checks, amounted to an account stated between the parties plaintiff and defendant herein, and worked an estoppel against the plaintiff."

In line with the foregoing, see the following of our own cases: *Benton County Bank v. Walker*, 85 Iowa 728; *First State Bank of Corwith v. Williams*, 143 Iowa 177; *Des Moines Nat. Bank v. Sisson*, 143 Iowa 191; *State Bank of Prairie City v. Cooper*, 201 Iowa 225; and *First Nat. Bank of Missouri Valley v. Williamson*, 205 Iowa 925.

In view of the fact that the basic invalidity of the checks in question was that the name of the payee was false and fictitious, the discovery of that fact would necessarily explode the whole transaction. The ready means of discovery by reference to the cards was at all times in the possession of the plaintiff. An actual reference to the cards would have disclosed the fiction. The plaintiff purported to use its facilities for such information, but failed in fact to do so. Can it excuse its failure by charging the same to a faithless officer? We think not. While it was not chargeable with the actual knowledge acquired by its faithless officer, it was chargeable, nevertheless, with the performance of its own duties, and no less so because it delegated the same to a faithless officer. In our recent case of *McCornack v. Central State Bank*, 203 Iowa 833, relied on by the plaintiff, we recognized the doctrine here under consideration, and we awarded a

new trial to the defendant on the issue of plaintiff's negligence, as contributory to the injury sustained. The evidence in this record is distinctly stronger in its tendency to prove negligence than appeared in the *McCornack* case.

We are of opinion that the very system under which the plaintiff was operating, and pursuant to which the defendant was co-operating, imposed upon the plaintiff a reciprocal obligation not otherwise implied in the law. This was to obey the requirements of its own system, upon which it had impliedly invited the drawee-bank to rely. The system itself was theoretically perfect for its purpose, and a prudent banker might be justified in putting great reliance thereon. The persistent and long-continued failure of the plaintiff to observe the requirements of the system was apparently the efficient cause of the resulting loss. If a jury should so find, the resulting loss should be allotted accordingly.

We are of opinion that the plaintiff was not entitled to a directed verdict, and that the issue on the question of plaintiff's negligence should have been submitted to the jury.

The judgment below is, accordingly,—*Reversed.*

All the justices concur.