FOURNET, Justice.
 

 This is a suit by the receivers of the Celotex Company to recover the sum of $20,052 from the Gretna Trust & Savings Bank, in liquidation, for its alleged unlawful payment of funds on deposit in the bank belonging to plaintiff on checks bearing forged indorsements. There is attached to plaintiff’s petition a detailed list of the numerous checks which show that they were issued weekly, beginning April 29, 1928, up to and including March 1,1933, for sums ranging from $2 to $20 respectively.
 

 The defendant pleaded the prescription of one and three years, and with reservation of its rights thereunder, filed an answer to plaintiff’s petition, denying liability and coupled with its answer a plea of estoppel. Defendant also called in warranty the Canal Bank & Trust Company, in liquidation, the Hibernia Bank & Trust Company, in liquidation, the American Bank & Trust Company, the Whitney National Bank, and the Interstate Trust & Banking Company, in liquidation, on whose indorsements the checks were cashed.
 

 The several New Orleans banks filed answers to the call in warranty, reserving the benefit of all exceptions, pleadings, and defenses made by the defendant, and denied that the Gretna Trust & Savings Bank paid the checks on their respective indorsements.
 

 The trial judge rendered judgment in favor of the defendant and the New Orleans banks called in warranty and against the plaintiff, maintaining the plea of estoppel, and dismissed the plaintiff’s suit at its cost. The plaintiff appealed.
 

 The facts which gave rise to this litigation were accurately stated by the trial judge in his written reasons for judgment, from which, for the purpose of properly disposing of the issues here involved, we quote as follows:
 

 “There was employed in the timekeeper’s office of the plaintiff, a clerk by the name of Joseph E. Vanderbrook, who had been an assistant to the timekeeper. Vanderbrook was employed in the year 1925. Vanderbrook’s duties consisted in assisting in making up the payroll from the time-cards and distribution sheets, and also in making up part of the checks, that is they would put in the name and date on the check on an addressograph machine and send it to the cashier’s office, where they filled in the amount from the payroll.
 

 
 *875
 
 “Vanderbrook admits that he caused the name of the payee to be inserted in those checks and that he got the proceeds represented by those checks. The system employed by Vanderbrook to obtain money on these checks was about along this line:
 

 “He made up false time-cards and punched these to show the time due, by manipulating the punch-in and punch-out clocks. He usually manipulated these checks on a Sunday morning. He then had false distribution sheets made up, to correspond with the time-cards and would place the name of one of the labor-checkers on these distribution sheets. From these false time-cards and distribution sheets he would cause fictitious names to be placed on the payroll to correspond with the time-card and distribution sheet.
 

 “There were also real distribution sheets that were handled by the labor checkers, but the false labor sheets never left Vanderbrook’s possession. When the real, genuine distribution sheets came back to the office, Vanderbrook would insert the false distribution sheets in the bundle at the end of the week. After the paymaster made his rounds through the plant and after staying at the gate for the purpose of paying off men who came in, there was always some checks left over, and these were taken to the cashier’s office. Later on, Vanderbrook would send in to the cashier’s office and have the paymaster send out to him these various checks which were left over, some would be genuine and others would be false checks. The false checks he would extract, write the name of the payee on the back, and cash them in the City of New Orleans. They were mostly cashed through a Mr. Gerstner and a Mr. Wakefield, the latter a hand-book operator in the City of New Orleans.
 

 “This practice was continued and operated by Vanderbrook for a period of about five years, before it was discovered.
 

 “Attached to the petition is a typewritten list of forty-four pages, single-spaced, listing checks which are alleged to have been issued and cashed by Vanderbrook and paid by Gretna Trust and Savings Bank.
 

 “An inspection of the list, together with the checks thems.elves, show that commencing with July 8, 1929, Vanderbrook had checks issued in the names of fictitious persons, from as little as one (1) person to as many as eight (8) in some weeks. Commencing with July 1,1931 and ending March 1, 1933, a period of about one year and eight months, it is to be noted that Vanderbrdok used practically the names of the same individuals, sometimes using eight, ten and twelve fictitious names on the payroll. It is to be noted that the names of ‘Octave Dewey’, ‘Lloyd Lorie’, ‘Richard Bourgeois’, ‘Sidney R. Breaux’, ‘Louis Savoie’, ‘Ernest Naquin’, ‘Irving Collette’, ‘Robert Burbach’, ‘William Templet’, ‘Nolie Duplantis’ and one or two others appear continuously on these payrolls during that period of time.
 

 “Vanderbrook testified that he did not cash any of these checks at the Gretna Trust and Savings Bank at all. They were all cashed in the City of New Orleans, at two particular places. There were sixteen hundred and sixty-three checks that were introduced in evidence, some endorsed with
 
 *877
 
 lead pencil, some with red pencil and some with ink, and he testified that the names that appear on the hack of the checks, were put on by him and that he recognized his handwriting to a certain degree, with the exception of twelve certain checks, which are listed in his testimony.
 

 “Vanderbrook, in the majority of times, punched on each time-card, about ten hours of work by manipulating the clock and would punch about ten or twelve of these cards some weeks and some weeks about seven or eight.' He would put the cards in a machine each day as he went along, and after he got through, he would get the clock set back to its original position, by just turning the hands.
 

 “It appears that when the bank crisis occurred, the plaintiff company proceeded to pay its employees with cash instead of checks,, but the checks were used for receipts for the cash. There were no signatures on the face of the checks, but the checks were made up just the same as they had been previously made' up, and they would make the employee endorse the check, and give him the cash when he called for his money. He was discovered as a result of getting the cash of Robert Burbach, Louis Savoie, Alfred Tessin, Arthur Falghou, Nolie Duplantis, Ernest E. Naquin, Sidney R. Breaux and Richard Bourgeois. These names had been placed upon the payroll by Vanderbrook and he sent in to the cashier’s office for the money to pay the check. He had the checks and endorsed them back to the paymaster for the money. In the meantime, Bowker had his suspicions directed to Vanderbrook by Beck, the paymaster, and Buckley, another employee, who had been stationed in the paymaster’s office, during the time they were paying the employees off in cash, and they noticed Vanderbrook had extracted certain checks from the pile of checks and placed these extracted checks in the drawer of his desk, and they were under the impression that he was endorsing the checks upon the back while they were in his desk drawer and it was then Bowker, the auditor, proceeded to lay the trap to discover Vanderbrook’s manipulations. And when the gates were guarded to determine which men went in and which men went out, and the checks were checked over and certain of the checks found to be uncreased and clean, a pay envelope was made up, the serial number of the bill was taken, and upon each piece of currency, the initial with indelible ink was placed in one corner by the cashier.
 

 “After determining that certain of the checks were fictitious and after determining that four men got their pay and went through the gates, as soon as Vanderbrook had sent for the checks and the envelopes containing the cash to correspond with the checks, Bowker confronted him and informed him of the four men who had gotten their pay, had come into the gate and wanted to know what he had done with the checks and the pay envelope. At first Vanderbrook denied that he had them and contended that he had paid -the men off, but later on, he broke down and made a complete confession.”
 

 Plaintiff relies on that well-established principle and rule of law that the obligation of the depository to its depositor is that it
 
 *879
 
 will pay out the depositor’s money only upon and in accordance with depositor’s express direction, and contends further, that if an indorsement is fictitious, even if the payee of the instrument is a fictitious person, that, nevertheless, the indorsement of such fictitious payee’s name is classified as a forged indorsement, and payment thereof by the depository bank cannot be charged against the depositor’s account, but that the depository bank must bear the loss of the amount so paid.
 

 The defendant does not question the correctness of the decisions cited by plaintiff’s counsel in their voluminous brief, nor the principles therein embodied, but contends that the Celotex Company should bear the loss of the amount claimed for the reason that the proximate cause of the loss was due to its own careless and negligent manner of operating its business, in that it permitted, for a period of nearly five years, the defalcation of its trusted employee to go unnoticed when it had within its possession every available means of detecting the same, but failed to do so, and therefore, plaintiff is estopped from asserting its claim against the defendant, Gretna Trust & Savings Bank, in liquidation.
 

 Under the title “Who must bear loss as between drawer induced by fraud of employees or agent to issue check.payable to non-existing person or a person having no interest in the proceeds thereof, and one who cashes or pays it on the forged indorsement by such employee or agent of the name of such ostensible payee,” the general rule is stated in 99 A.L.R. 439 as follows:
 

 “The general rule may be stated to be that where an employee or agent fraudulently procures his employer or principal to issue checks payable to fictitious persons, not known to the employer or principal to be fictitious, or to persons not having an interest in the proceeds of such checks, and cashes the same upon the forged indorsement by him of the names of such persons, the loss falls upon the depository cashing it.”
 

 After citing numerous authorities, at page 441 of 99 A.L.R. it is further stated:
 

 “A generally recognized or assumed qualification of the general rule, however, is that it presupposes that the drawer himself was not negligent or guilty of such conduct as" would estop him from asserting the forged character of the indorsement as-against the depository, and that if he was negligent or guilty of such conduct, the loss must fall on him,” citing Kaszab v. Greenebaum Sons Bank & T. Co., 252 Ill.App. 107 C. E. Erickson Co. v. Iowa Nat. Bank, 211 Iowa, 495, 230 N.W. 342; Grand Lodge, A. O. U. W., v. State Bank, 92 Kan. 876, 142 P. 974, L.R.A. 1915B, 815; Jordan-Marsh Co. v. National Shawmut Bank, 201 Mass. 397, 87 N.E. 740, 22 L.R.A.(N.S.) 250; Detroit Piston Ring Co. v. Wayne County & Home Sav. Bank, 252 Mich. 163,. 233 N.W. 185, 75 A.L.R. 1273; American Sash & Door Co. v. Commerce Trust Co., 332 Mo. 98, 56 S.W.(2d) 1034; Shipmen v. Bank of State, 126 N.Y. 318, 27 N.E. 371, 12 L.R.A. 791, 22 Am.St.Rep. 821; New York v. Bronx County Trust Co., 261 N.Y., 64, 184 N.E. 495; Id., 261 N.Y. 622, 185 N.E. 765; Pennsylvania Mut. L. Ins. Co.
 
 *881
 
 v. North Penn Bank, 70 Pa.Super. 34; Brixen v. Deseret Bank, 5 Utah, 504, 18 P. 43; Defiance Lumber Co. v. Bank of California, 180 Wash. 533, 41 P.(2d) 135, 99 A.L.R. 426. * * *
 

 "Under the above qualification of the general rule, the depositor’s negligence or conduct which would estop him must be the proximate cause of the payment by the depository upon the forged indorsement.”
 
 (Italics ours.)
 

 On the same subject-matter, Corpus Juris, vol. 7, at page 686, § 414, states the rule as follows: “As a bank is authorized to pay only to the person designated by the depositor, it cannot charge against the depositor’s account an amount paid by it on a forged indorsement of the depositor’s check,
 
 unless such payment is properly attributable: to the negligence or other fault of the depositor.
 
 * * * ” ■ (Italics ours.)
 

 The Supreme Court of the state of Washington had for consideration a case very similar to this one, in Defiance Lumber Company v. Bank of California et al., 180 Wash. 533, 41 P.(2d) 135, 140, 99 A.L.R. 426, involving the issuance of checks to fictitious individuals, and the manipulation of time clocks in almost the identical manner as in the instant case. The checks were cashed at various banks, and eventually paid by the defendant bank on which they were drawn. And the court, in a well-reasoned opinion, after reviewing the authorities on the subject-matter, arrived at the following conclusion:
 

 “We are clearly of the opinion that appellant, by its careless and negligent conduct of its own business, permitted its own employee to perpetrate upon it a gross fraud, and that it cannot now recoup its losses by passing the burden thereof to respondent. Appellant set up the machinery which resulted in the loss, itself took into its employ the man who stole its money, continued him for a long period of time in a position of trust and authority, failing to observe, as we view it, the slightest care to see that it was protected against such fraud as was in fact perpetrated, either by some reasonable check of its employees, by adequately guarding its time clock or its time cards, or by maintaining an adequate system of accounting by Which any such loss as that which occurred would have been avoided.”
 

 And the court stated further:
 

 “The rule that a bank which pays a check upon a forged indorsement must stand the loss is limited to instances in which the acts of the depositor have not increased the risk lawfully resting upon the bank.
 
 The equitable doctrine that, as between tzvo innocent persons, the one whose act zvas the cause of the loss should bear the consequences, applies in many cases.
 
 * * * Manifestly, * * * no specific rule can be laid down as to just what conduct on the part of the drawer of a check will constitute negligence sufficient to preclude him from holding the drawee bank liable for paying his check upon a forged indorsement;
 
 each case depending upon its ozvn circumstances.”
 
 (Italics ours.)
 

 In the case of C. E. Erickson Co. v. Iowa Nat. Bank, 211 Iowa, 495, 230 N.W. 342, 344, where the facts showed that pay roll
 
 *883
 
 checks were fraudulently procured by an officer of the drawer, payable to former employees, and paid by the drawee bank upon the forged indorsement by the officer of such employees’ names, the court said:
 

 “If the drawee-bank in paying the check reasonably believed that the payee was a present employee, it might also reasonably believe that the indorsement was genuine.
 
 In such event the plaintiff would be chargeable with negligence in inducing the belief. *
 
 * * If in this case the representations of fact made on the face of the checks by Bridges, as the signer thereof, might reasonably be relied upon by the drawee, and if when so relied on they reasonably tended to relax further investigation on the part of the drawee, for its own protection, then they worked an estoppel against the plaintiff.” (Italics ours.)
 

 In the case of Kaszab v. Greenebaum Bank & T. Co., 252 Ill.App. 107, 114, where, as in the case at bar, an employee padded his employer’s pay roll and cashed checks made payable to persons not in its employ, upon the forged indorsements of the names of such persons, it was held that the fact that the employee continued to forge indorsements for a period of nineteen months, during which time he cashed 468 checks, without being detected, although monthly statements were furnished by the bank to the plaintiff, required the submission of the question of the employer’s negligence to the jury.
 

 In that case the appellate court of Illinois said:
 

 “Banks deal with a great number of depositors and, while they owe an obligation to their customers, nevertheless, in view of the great number of transactions carried on in the course of a banking day, it becomes incumbent upon the depositor to assist by exercising some sort of supervision over his own individual account. It is not fair to the bank for such a depositor to ignore his own responsibility and rely solely upon the diligence of the institution with which he is doing business. This would appear to be particularly true where the depositor is in a better position to discover the fraud practiced upon him through the agency of an employee closely associated with and under his direct supervision and control.”
 

 The Gretna Bank cashed the checks in question in the usual, ordinary manner, in good faith, and in due course of business. The evidence shows that none of the checks were cashed at the window of the Gretna Bank, but were all cashed by a Mr. Gerstner and a Mr. Wakefield, handbook operators, who subsequently cashed the checks at the various New Orleans banks, which sent them to the defendant for payment upon their respective indorsements thereof. Plaintiff’s checks, after payment and cancellation, were returned to it monthly, together with a statement and notation thereon to please examine at once, and if no errors were reported in ten days, that the account would be considered correct.
 

 The fact that plaintiff, through its authorized officers and agents issued to designated parties these checks, which appeared on their face to be regular pay roll checks, justified the defendant in believing that the payees thereof were regular employees of
 
 *885
 
 plaintiff and the indorsements thereon genuine. Moreover, the repeated issuance of the checks in the manner herein pointed out from week to week and year to year, and particularly during the last two years when the checks were made payable to the same named twelve employees, was not only sufficient to induce a cautious and careful person to believe and conclude that such checks were issued to plaintiff’s bona fide employees and the indorsements thereon were genuine, but would also tend to place the bank in such a position that it could be imposed upon by plaintiff’s trusted officer.
 

 The record, conclusively shows that during the entire period during which the checks wefce fraudulently issued and cashed through Vanderbrook’s manipulations, neither plaintiff’s officers nor its employees ever made a single check of its pay roll against the men actually employed or against the labor records. Plaintiff’s own witnesses testified that had such a check been made, it would have revealed Vanderbrook’s fraud.
 

 A well-established rule of equity is applicable here, i. e., that “where one of two innocent parties must suffer loss through the fraud of another, the burden of the loss should be imposed on him who most contributed to it.” Thompson v. Hibernia Bank & Trust Co., 148 La. 57, 58, 86 So. 652, See, also Haley v. Woods et al., 163 La. 911, 113 So. 144; Brooks-Scanlon Co. v. Illinois Central Railroad Co. (C.C.A.) 257 F. 235; Boatsman v. Stockmen’s National Bank, 56 Colo. 495, 138 P. 764, 50 L.R.A.(N.S.) 107; Crippen, Lawrence & Co. v. American National Bank, 51 Mo.App. 508; Stout v. Benoist, 39 Mo. 277, 281, 90 Am.Dec. 466.
 

 We are of the opinion that under the facts and circumstances of this case the carelessness, negligence, and laches of the plaintiff are the direct and proximate cause of the loss,, and, therefore, it is estopped from claiming reimbursement from the Gretna Trust & Savings Bank, in liquidation.
 

 The conclusion reached by us renders it unnecessary to consider the other questions presented.
 

 ^01" the reasons assigned, the judgment the lower court, is affirmed,
 

 O’NIELL, C. J., absent,