## SUNSERI et ux. v. EUREKA HOMESTEAD SOC. et al.*

### No. 16634.

Court of Appeal of Louisiana. Orleans.

Feb. 21, 1938.

M. E. Culligan, of New Orleans, for appellants.

McCloskey & Benedict and W. Sommer Benedict, all of New Orleans, for appellees.

JANVIER, Judge.

Mr. and Mrs. Joseph Sunseri, during the latter part of the year 1932, were desirous of obtaining approximately $1,800 for the purpose of paying certain taxes and pav-ing charges which were assessed against real estate owned by them and located on General Taylor street in this city. The Eureka Homestead Society was familiar with the property and with the unfortunate circumstances which had caused Mr. and Mrs. Sunseri to fail to pay the taxes and paving charges (which we shall hereafter refer to as the "charges") and the said society was itself interested in seeing that the said charges were paid since it held a vendor's lien and mortgage on the property referred to. Accordingly, it agreed to make a loan in the sum of $1,800, or for so much as might be estimated would be sufficient to pay the said charges and expenses of title examination, notarial costs, etc., to be incurred in connection with the newly contemplated loan. This loan was to be secured by mortgage on the homestead plan on certain other real estate of Mr. and Mrs. Sunseri located elsewhere in New Orleans. The loan was consummated on January 30, 1933, by act of sale and resale executed before Albert E. Moulin, notary public, acting for Percy S. Benedict, the regularly designated notary public of the society. At the time of the execution of these acts Mr. Moulin advised Mr. and Mrs. Sunseri that he had received from the society instructions reading as follows:

"Loan of $1,800.00 was recommended on condition that the entire proceeds be disbursed by us for taxes and paving on the property 4501 General Taylor Street upon which this Society is presently carrying mortgage. Please see that these instructions are carried out."

He therefore stated that he could not deliver the check to Mr. and Mrs. Sunseri, but that he would accompany them to the offices of the proper officials and would assist them in making payment of the charges. He handed the check representing the loan to Mr. and Mrs. Sunseri, who indorsed it and handed it back to him, but who advised him that they did not wish the charges paid at that time since they felt that they could secure a reduction in the amount thereof. Accordingly, Mr. Moulin retained the check for a few days, and then, being advised by the Sunseris that they were still attempting to obtain a reduction in the charges and did not want him to make payment at that time, deposited the proceeds in the Hibernia Bank & Trust Company, then a supposedly solvent bank, in this city, the deposit being made in a segre-

*Rehearing refused April 4, 1938.

gated account which Mr. Moulin maintained in connection with his notarial affairs and into which he deposited only moneys coming into his possession in connection with his notarial business. Later Mr. and Mrs. Sunseri succeeded in obtaining a reduction in the amount of the charges and advised Mr. Moulin of their desire that he accompany them to the office of the proper officials to make payment. At that time the Hibernia Bank & Trust Company was still operating on an unrestricted basis. However, Mr. Moulin, because of other professional engagements, found it impossible, until a short time later, to attend to the said payment, and made an appointment to meet Mr. and Mrs. Sunseri on March 3, 1933, and to then carry out the purpose for which the loan had been made and pay the said charges. It is almost unnecessary that we refer to the historic fact that, prior to March 3, the Hibernia Bank & Trust Company was closed by the executive declaration of a "bank holiday" and never reopened on an unrestricted basis. Through distributions which have since been made on behalf of the formerly solvent institution a certain portion of the charges have since been paid, but there yet remains due, as we read the record, $949.61, and it is for the recovery of this amount that this suit is brought.

The basis of the complaint of plaintiffs is that they contracted with the homestead society for the payment of the said charges and that, as soon as they signed the notarial acts and the mortgage notes in connection therewith, the said society became obligated to pay the charges. In other words, they maintain that they contracted with the society not for the borrowing of money, but for the payment by that society of their charges, and had no control over the funds resulting from the loan; that they, in effect, said to the society: "We will give you a note secured by mortgage if you will pay our taxes and paving charges."

Plaintiffs also maintain that the loss would not have occurred had the society permitted them, before closing the loan, to negotiate for the reduction in their charges. They contend that they did not wish to make the loan at the time at which it was made and that they desired first to obtain the reduction, but that the society insisted that the documents be executed at that time and that the loan be consummated then.

In addition to the homestead society, plaintiffs have also made defendants both Mr. Benedict, the notary for whom it is conceded that Mr. Moulin was acting, and also Mr. Bernard McCloskey, the surety on the notarial bond of Mr. Benedict. The theory of plaintiffs as to Mr. Benedict's liability is not clearly set forth in the petition and we can only conjecture that it is based on the fact that Mr. Moulin, who had acted for Mr. Benedict in the execution of the notarial documents, had, after he was advised by the Sunseris to make payment, delayed too long in doing so.

When the matter was tried in the district court, the judge a quo dismissed the suit and gave exceptionally clear and terse reasons for doing so. He said:

"I am of the opinion that when the Sunseris endorsed the check payable to them and requested that the payment of the taxes be delayed until a reduction might be obtained, they assumed full responsibility for the deposit of the funds in a then sound bank. The subsequent delay by Mr. Moulin (if there was a delay), was not unreasonable. * * *"

We first consider the contention that, had the society not insisted that the loan be made before the Sunseris had negotiated for the reduction in charges, it would not have been necessary that the proceeds remain for any length of time in the custody of the notary, and, therefore, would not have been in the bank deposited in the account of the notary at the time the bank closed. In the first place, the record fails entirely to show that the Sunseris made any real objection to the closing of the loan at the time at which it was made. The evidence does not convince us that they protested against the execution of the mortgage, but, on the contrary, it shows conclusively that they signed the notarial acts, executed the note, and indorsed in blank the check which was payable to their order. Whatever may have been their original attitude concerning a delay for the purpose of obtaining a reduction in the charges, they may no longer point to that attitude and to that objection, if they made any, since, without further objection, they consummated the transaction and, as a result, placed the money in the hands of the notary. Nor does the record show, as a matter of fact, that when they first discussed with the society the question of the loan they asked that it be delayed until they could obtain a reduction.

The next argument is that the society itself contracted to pay the charges and, having received the note secured by mortgage, is obligated to do so. The record shows that that was not the agreement. The society did not agree to pay the taxes; it agreed, on the contrary, to loan to plaintiffs the money with which payment might be made. As conclusive evidence of this fact, there is in the record the check itself, payable to and indorsed by the plaintiffs. True enough, the society required that they apply the proceeds to the payment of the taxes, and true also it is that, in order to insure the destination of the money, the society required that Mr. Moulin see that the proceeds be transmitted to the proper authorities. But that was a requirement which the society was justified in making and which the Sunseris either agreed to in advance, or acquiesced in at the time they indorsed the check.

The record does not convince us that they did not understand in advance that Mr. Moulin was to hold the check and see to it that it was devoted to the payment of the charges. In fact, Mrs. Sunseri, who seems to have been the moving spirit in the transaction, very clearly shows that she knew, when the loan was first agreed to, that the society would insist on this method of payment. She testified:

" * * * I just went over to borrow this money and I felt they were going to insist on it and so they did, that they should pay every nickel out and if I had any money over they would take back."

The society was justified in making the requirement because the record shows that at that time, during the so-called depression, no ordinary loans were being made, and that this loan was made by the society only because of its desire to assist in procuring the release of prior charges and liens attaching against property on which it held the mortgage. Surely, under such circumstances, a homestead association may make a loan conditioned upon the destination of the proceeds to such a stipulated purpose and, if so, just as surely it may take precautions to make certain that the proceeds are so applied. If the borrower consents to such a method of making payment, or acquiesces therein, he may not later complain. If that was not the agreement, the borrowers here might have refused to consummate the transaction on that basis. They did not refuse.

Plaintiffs declare that they did not agree in advance that the proceeds might be retained by the notary and by him applied to the stipulated purpose. Whether or not plaintiffs agreed in advance as to the method to be followed in the payment of taxes is unimportant since, as we have said, they consented thereto when the loan was consummated and, in fact, they went much further and requested not only that Mr. Moulin hold the proceeds, but that he hold those proceeds for an indefinite time. When they did that they authorized him, as the custodian of their fund, to take such care of it as a reasonably prudent person would take of such a fund—in fact, to take such care of it as a reasonably prudent person would take of his own property. Civ.Code, art. 2937. Mr. Moulin placed the fund in a segregated account in a banking institution which, so far as he then knew, or could know, was amply solvent. He could do no more.

There is, then, no liability unless the facts justify the conclusion that, after Mr. Moulin was finally requested by the Sunseris to pay the charges, he delayed too long in doing so. Mr. and Mrs. Sunseri give no accurate testimony as to the day on which they advised Mr. Moulin that they had been granted the reduction and desired that he make payment. He, on the other hand, testified from his records and gave dates which we believe to be accurate. He said:

" * * * I received, according to my records as near as I can work out the exact date, information on March 1st that the allowances on the interest that Mrs. Sunseri was hopeful of getting, had been made and that we could now make an arrangement to go to the City Hall and I could satisfy myself the money was going on the property the Homestead wanted it. I couldn't make an appointment on that day because I had, in addition to the usual routine matters, at the office, two acts of sale to pass in the afternoon. I couldn't go the next day because I was one of the two trial attorneys in two cases before Judge Byrnes. Mr. Sommer Benedict was the other trial attorney. Those two cases we expected would take the entire day and so the only day I had available was Friday the 3rd, the 3rd day of March 1933. March 2nd was a legal holiday and March 3rd the banks opened up on a five percent restricted basis."

It is very evident, then, that the delay which resulted from Mr. Moulin's inability to make payment was very short. If he received instructions on March 1st, as it later developed, that was the last day on which the bank operated unrestrictedly. Surely, it cannot be said that he was negligent in not immediately giving up all his other professional engagements to attend to that one matter, since, of course, he had no knowledge of the impending insolvency of the bank. He did not know that the bank would not open on March 3d and, as a matter of fact, if he had made payment on March 1st, he would have done so by check, which, in all probability, would not have reached the bank on which it was drawn until after it had closed. We find, then, no negligence whatever on his part.

We conclude with our brother below that "the subsequent delay of Mr. Moulin (if there was a delay) was not unreasonable."

It is therefore ordered, adjudged, and decreed that the judgment appealed from be and it is affirmed at the cost of appellants.

Affirmed.

## McCALEB, Judge (concurring).

While the underlying cause of the loss of the money herein sought to be recovered was the failure of the Hibernia Bank & Trust Company, the case would not have arisen had it not been for the delay of the notary in not paying the taxes promptly in accordance with the instructions of the homestead as contained in its letter of December 19, 1932. The question is, therefore, Who is responsible for this delay? The loan made by the homestead to the plaintiffs was granted only on the condition that the proceeds would be disbursed by the former for taxes and paving charges then due on the property 4501 General Taylor street and plaintiffs acquiesced in this arrangement. Accordingly, instructions were given by the homestead to its agent, McCloskey & Benedict, that the proceeds were to be withheld for immediate payment to the tax collector. The only reason why these instructions were not carried out was because the Sunseris prevailed upon Mr. Moulin to hold the money until such time as they could obtain a reduction in interest on the paving charges bearing against the property.

It is my view that, if the proceeds of the mortgage had been lost as a result of an unreasonable delay on the part of the homestead or its agent in making payment of the taxes, then the loss should be borne by the homestead as it undertook to disburse the monies for the account of the plaintiff. But such is not the case for, as stated above, the postponement of the disbursement of the funds resulted solely and exclusively from the act of the Sunseris in prevailing upon Mr. Moulin to refrain from paying the taxes until such time as they could obtain certain reductions. When Mr. Moulin acceded to their request, he acted not as the agent of the homestead, but as the representative of the Sunseris and he became custodian of the funds for their account.

I fully agree with my associate that Mr. Moulin, acting as subagent of McCloskey & Benedict, was free from negligence in the handling of this money forasmuch as he deposited the same in a bank which he had every reason to believe was solvent. It may be argued, however, that Mr. Moulin deviated from the instructions given him by the homestead when he permitted the plaintiffs to induce him to defer payment of the taxes until they could obtain a reduction. Be this as it may, the plaintiffs should not be permitted to hold the homestead for Mr. Moulin's technical breach of the mandate inasmuch as there is no evidence to exhibit that it ratified his act in failing to pay the taxes promptly as he was directed and even if the homestead had acquiesced in this arrangement, the money could not be fairly said to be on deposit at its risk during the period it was being withheld for plaintiffs' benefit. Moreover, it is my view that plaintiffs cannot succeed against McCloskey & Benedict on this score for the reason that the delay which caused the loss of the funds resulted primarily from their request for Mr. Moulin to hold the funds for their account until they were able to obtain the desired reduction in taxes.

There is a well-established rule of equity, which I believe is particularly pertinent to this case, and that is where one of two innocent parties must suffer loss through the fraud of another, the burden of the loss should be imposed upon him who most contributed to it. See Young v. Gretna Trust & Savings Bank, 184 La. 872, 168 So. 85, and cases there cited. While the rule has

been invoked in fraud cases, there is no reason why it is not equally applicable to cases where the loss results from insolvency.

For these reasons, I respectfully concur in the decree.

WESTERFIELD, Judge (dissenting in part).

I concur with my colleagues in their holding that Messrs. Bernard McCloskey and Percy Benedict, made codefendants, are without responsibility in the premises. I believe, however, that the Eureka Homestead Society, by insisting that it retain possession of the proceeds of mortgage loan in order to assure the payment of the taxes, should be held responsible for the loss occasioned by the collapse of the bank in which its agent placed the money. I, therefore, respectfully dissent from that portion of the opinion and judgment which absolves the Eureka Homestead Society.