MOISE, Justice.
 

 Defendant-appellant, Pioneer Bank & Trust Company, has appealed from a judgment of the district court which allowed plaintiff-appellee, Clark-Kelley Livestock Auction Company, to recover from the Pioneer Bank & Trust Company the sum of $6,028.41.
 

 Plaintiff-appellee has answered the appeal and is asking this Court to award it the full amount of $18,447 sued for.
 

 During the period with which this litigation is concerned Clark-Kelley Livestock Auction Company, a partnership composed of P. O. Clark and A. H. Kelley, operated an auction barn in Bossier Parish, Louisiana, and did an extensive business involving a great amount of cash, checks and drafts.
 

 Plaintiff-appellee maintained an active checking account with the Pioneer Bank & Trust Company, a Louisiana banking dorporation domiciled at Shreveport, Louisiana. Some months its deposits ran as high as $100,000.
 

 This suit is the result of the admitted dishonesty of C. L. Daniel, plaintiff’s bookkeeper and general manager. By reason of his embezzlement and forgery, he has been convicted and sentenced to the state penitentiary.
 

 The money sued for is alleged to be represented by sixteen checks especially endorsed by plaintiff to defendant; by a bank money-order specially endorsed by plaintiff to defendant; a check upon which the endorsement of the payee is alleged to have been forged; two checks upon which the endorsement of the payee is alleged to have been forged and upon which the endorsement of the plaintiff was without authority; and two checks upon which the name of the payee is alleged to have been erased, and the name of another payee substituted — ■ neither the original payee nor the substituted payee endorsing the checks.
 

 
 *227
 
 The gravamen of plaintiff’s contention is that:
 

 (a) A bank which diverts the proceeds of a check or money order specially endorsed to it by a depositor to a use other than that of said depositor is liable to the depositor for the amount of such proceeds;
 

 (b) A bank which pays a check drawn on it by a depositor upon a forged endorsement of the payee or the endorsement of the depositor by an unauthorized agent is liable to the depositor for the amount of the check;
 

 (c) A depositor who fails to examine his monthly bank statement and detect and report to the bank losses resulting from wrongful acts of his agent is not estopped to recover such losses from the bank where a negligent or wrongful act of the bank itself, without which the losses would not have occurred, was the proximate cause thereof.
 

 Of course, all of these contentions must be considered from the four corners of the record. After that examination, the Court will apply the law.
 

 The defendant bank avers that C. L. Daniel was plaintiff’s agent; that his power to cash checks was unlimited; that the endorsements placed on the checks were not restricted; that plaintiff was grossly negligent in not checking its accounts as to irregularities ; that plaintiff is estopped from recovery because, although it received its cancelled checks and a statement monthly, it did not immediately report irregularities; and that where one of two innocent parties must suffer loss through the fault of another, the burden of the loss should be imposed on him who most contributed to it.
 

 Mr. Friedman, the cashier of the defendant bank, testified that he visited plaintiff’s place of business in Bossier Parish with the express purpose of finding out the manner in which plaintiff desired the account to be handled; that he talked to Mr. Kelley about the manner in which the account was to be handled, and that Mr. Kelley introduced him to Daniel and told him
 
 to
 
 discuss that with Daniel since he was their manager and would be in charge of the company’s banking business, including deposits, withdrawals, drafts, collections, endorsements, and all matters connected with the account. According to Mr. Friedman’s testimony, he ordered a rubber stamp at plaintiff’s request and together with the bill turned it over to Daniel. The rubber stamp was in the following words:
 

 “Pay To The Order Of Pioneer Bank & Trust Company
 

 84-450 Shreveport 84-450
 

 1111 Louisiana 1111
 

 All prior endorsements Guaranteed Clark-Kelley Auction Co. Route 2, Benton, La.”
 

 Defendant’s evidence shows that Mr. Clark and Mr. Kelley brought Daniel to
 
 *229
 
 the office of the president of the Pioneer Bank & Trust Company, and Daniel’s signature was added to the authorization card (Exhibit P-28), which reads as follows:
 

 “Name Clark-Kelley Auction Company
 

 “Pioneer Bank & Trust Co., Shreveport, La.
 

 “In receiving items for deposit or collection, this Bank acts only as depositor’s collecting agent and assumes no responsibility beyond the exercise of due care. All items are credited subject to final payment in cash or solvent credits. This bank will not be liable for default or negligence of its duly selected correspondents, nor for losses in transit, and each correspondent so selected shall not be liable except for its own negligence. This Bank or its correspondents may send items, directly or indirectly, to any Bank, including the payor, and accept its draft or credit as conditional payment in lieu of cash; it may charge back any item at any time before final payment, whether returned or not, also any item drawn on this Bank not good at close of business on day deposited.
 

 “Authorized Signature .... P. O. Clark
 

 “Authorized Signature .... A. H. Kelley
 

 “Authorized Signature .... C. L. Daniel
 

 “Address Rt. No. 2, Benton, La.”
 

 Mr. E. R. Campbell, President of the defendant bank, testified that
 
 99%
 
 of plaintiff’s checks were drawn by Mr. Daniel. He stated that Daniel had no restrictions placed on him as to withdrawals.
 

 Mr. A. H. Kelley, a partner of the plaintiff company, testified that after he was assured of Daniel’s honesty he never supervised his work; that in early 1951 he learned that Daniel had appropriated two checks to his own use and had bought himself an automobile, but that he did not report the theft for several months. He stated that Mr. Daniel was responsible for seeing that petty cash was on hand at all times. He said that he and Mr. Clark took Mr. Daniel to the Pioneer Bank & Trust Company to sign the signature card. He testified that Daniel had authority:
 

 “To sign all cow checks. He had authority to sign all cow checks in payment of cattle and a petty cash check for $500.00. We tried to keep $500.00 in the petty cash at all times, and he had a right to draw those $500.00 checks.”
 

 He admitted that Mr. Daniel had authority to use discretion when the bank employees called with respect to drafts. The following testimony of Mr. Kelley is pertinent:
 

 “Q. Did you ever tell the bank or any official at the bank anything that Mr. Daniel couldn’t do down there? Did you list all the things he couldn’t do? A. No, sir, we never picked out any particular thing and told them he couldn’t do it.
 

 
 *231
 
 “Q. In other words insofar as the hank is concerned you didn’t advise them of any restrictions on him? A.
 
 No, sir.”
 
 (Italics ours.)
 

 Mr. P. O. Clark, the other partner of plaintiff company, testified in a vein similar to that of Mr. Kelley. He stated:
 

 “Mr. Daniel had the authority, and certainly our permission, to make deposits at the Pioneer Bank. He signed checks with our knowledge and authority, and handled certain other matters with the Bank that he had been instructed to do by either Mr. Kelley or myself, during the period.”
 

 The following testimony of Mr. Clark is pertinent:
 

 “Q. But you do know that Daniel has O.K’d drafts at the Bank? A. Yes, sir.
 

 “Q. He was authorized to draw checks, to pay drafts, if the occasion arose, was he not? A. He was authorized to endorse them with a rubber stamp — to place that money in the Bank.
 

 “Q. Did you and Mr. Kelley inform the Bank that this ‘is the man who will be in charge of making our deposits, and attending to our endorsements, and things-of that nature’? A. Generally, I’d say that’s correct. We told the Bank that he was our bookkeeper and would make the deposits, would sign our checks.
 

 “Q-. Would make the endorsements? A. There was nothing said about making the endorsements. He had authority to place this rubber stamp that was furnished us on these checks.
 

 “Q. Did- you, at any time, ever inform the Pioneer Bank & Trust Company that his authority was limited to placing that rubber stamp on the checks? A.
 
 No, had no right to.
 

 “Q. Now, Mr. Clark, Mr. Daniel was also authorized to draw checks to ‘Cash’ and go to the Pioneer Bank & Trust Company and cash these checks? A. Yes, sir, insofar as our ‘petty cash’ was concerned.
 

 “Q. Did you ever, at any time, inform the Bank that the purpose of the checks written to -‘Cash’ and signed by Daniel, which he was cashing were for a particular purpose? A. I’m not sure that I ever did; hut I’m sure the Bank knew what the checks were for. Some of them, as a matter of fact, I think were payable to ‘Petty Cash.’
 

 “Q. Did you ever, at any time, inform the Bank of any limitations of Daniel’s authority insofar as handling your bank account? A.
 
 No, sir. I didn’t think'it was necessary.”
 
 (Italics ours.)
 

 The evidence discloses that-Daniel, was in the defendant hank almost daily in connection with plaintiff’s business. He was called upon frequently with respect to
 
 *233
 
 honoring a. draft which had been drawn on Clark-Kelley Livestock Auction Compahy, and he also advised'the bank'how tó handle dishonored and returned items.' .' "
 

 Mr. Harry B. Walker, a certified public ■•accountant • employed by plaintiff, testified ■that, he- prepared an operating .statement, reconciled the bank statements, and prepared -tax returns. He .stated that Mr. Daniel was the office manager and bookkeeper of Clark-Kelley Livestock Auction Company;' 'that Daniel kept all records, made all deposits, and' signed the checks. Mr; Walker kept the general ledger át his office -iii' Bossier City, but Mr. Daniel brought'him'the information "needed. He did not have in his possession plaintiff’s stubs, showing the number of checks and the- amounts' of checks written during each month. Daniels gave him the cancelled checks and he- simply reconciled the bank statement by seeing that all deposits tallied with the deposit slips. Mr. Walker stated that Daniel, was the man. who went to the bank for Clark-Kelley; that once a week Daniel drew a check to replenish his cash; and that on- Thursdays Daniel . cashed che.cks at weekly auctions. He further stated that on 'June 30,' 1951,- he'made’a completé audit and discovered Daniel’s malfeasance which had been going on for nihe months — September' 1950' to May 1951.
 

 Defendant proved that beginning September: 1949 it -returned'to' plaintiff, monthly, all óf its-cancelled checks and a-'statement showing deposits and withdrawals; that this practice was continued during the entire life of the account. A comparison o'f these cancelled checks and statement with plaintiff’s check stubs would have disclosed that Daniel had not deposited the checks herein involved. For example; during the month of September 1950, Exhibits No. 3 and No. 19 were cashed. They were checks issued by Clark-Kelley Livestock Auction Company, paid by the defendant-bank in September 1950, and returned to the plaintiff company October 1, 1950. Another check, Exhibit No. 5, was cashed by the bank in October 1950, and returned to. plaintiff November 1, 1950. An examination of these cancelled checks returned monthly would have disclosed Daniel’s malfeasance from the very beginning. What can be said with respect to the above exhibits can be said with respect to each check, herein involved. The record shows that most of these checks were cashed at the paying teller’s window and that he placed the bank stamp on the checks showing that they-were cashed.
 

 According to the testimony of Mr. Walter and Mr. Clark, there was bound to be a variation between the actual condition of the accounts receivable and the total thereof as given Mr. Walker by Daniel. ' Had the accounts receivable been compared at any time with the figures given to-Mr. Walker, Daniel would have been-exposed. No ’-suela comparison was made. Whose duty was it to make such a comparison?
 

 
 *235
 
 Until Daniel actually listed the money on a deposit slip, there was no record of Clark-Kelley Livestock Auction Company ever having received it. Until it went on a deposit slip or was entered in the cash book, there was nothing for Walker, Clark or Kelley to check against. A simple audit, independent of Daniel, would have disclosed his dishonesty, but these partners permitted themselves to be at his mercy as to the state of accounts receivable.
 

 Defendant proved that C. L. Daniel handled the entire banking account of plaintiff; that he signed the company’s checks, made deposits and withdrawals, endorsed checks for plaintiff, O.K’d drafts which were drawn on plaintiff, cashed plaintiff’s checks on plaintiff’s account for needed money or petty cash in the operation of plaintiff’s business; and that since .there was never any objection by plaintiff, defendant was led to believe that Daniel was fully authorized to handle plaintiff’s account.
 

 A reading of the testimony of Mr. Clark and Mr. Kelley clearly shows that their conduct was such as to lead the bank to believe that Daniel was empowered to handle their bank account.
 

 In the case of Airey & Company v. Okolona Savings Institution, 33 La.Ann. 1346, this Court held:
 

 “While it is plain to us that plaintiffs have met with a serious loss in this venture, and that their confidence has been grossly abused, we fail to see how, under the evidence, this breach of confidence can possibly be brought home to the defendant, who has, as we believe, discharged every obligation imposed upon it by the contract, which was correctly understood by its officers, and cannot, therefore, be held responsible for the shortcomings of Ward, or for the misplaced confidence of plaintiffs either in Ward or in Seymour.”
 

 In Herbert v. Langhoff, 185 La. 105, 168 So. 508, 510, this Court held:
 

 “The rule is well established in this state and. elsewhere that, if a person by his conduct and course of dealings leads others to believe that a certain party is his accredited agent, he is es-topped from denying the agency when the rights of third .persons become involved through the acts and conduct of the ostensible agent.
 

 “The doctrine of ‘agency by estoppel’ is well recognized. But, as stated in Corpus Juris, vol. 2, § 70, p. 461; ‘The doctrine of estoppel involves only apparent or ostensible agency, which exists where the principal intentionally, or by want of ordinary care, induces third persons to believe another to be his agent although he did not in fact employ him. As to third persons, the distinction between actual and apparent or ostensible agency is unimportant as the liability of the principal and agent is the same in either case; but as be
 
 *237
 
 tween the parties themselves, of course, the ostensible agent is no agent at all. Apparent or ostensible agency is merely agency by estoppel and it is more strictly accurate to say that liability arises from the acts of so-called agent, not because there is any agency but because the principal will not be permitted to deny it.’ The same work, volume 2, § 212, P. 574, says:
 

 “ ‘Ostensible authority to act as agent may be conferred if the principal affirmatively or intentionally or by lack of ordinary care, causes or allows third persons to act on an apparent agency.’ ”
 

 Plaintiff is estopped to deny the authority of Daniel. Both members of the partnership were experienced business men, and had they exercised ordinary precautions they could have avoided a situation such as this. Can anyone recover because of a condition he was instrumental in producing?
 

 “A well-established rule of equity is applicable here, i. e., that
 
 ‘•where one of two innocent parties must suffer loss through the fraud of another, the burden of the loss should be imposed on him who most contributed to it.’
 
 Thompson v. Hibernia Bank & Trust Co., 148 La. 57, 58, 86 So. 652. See, also Haley v. Woods et al., 163 La. 911, 113 So. 144; Brooks-Scanlon Co. v. Illinois Central Railroad Co., 5 Cir., 257 F. 235; Boatsman v. Stockmen’s National Bank, 56 Colo. 495, 138 P. 764, 50 L.R.A.,N.S., 107; Crippen, Lawrence & Co. v. American National Bank, 51 Mo.App. 508; Stout v. Benoist, 39 Mo. 277, 281, 90 Am.Dec. 466. (Italics ours.)
 

 “We are of the opinion that under the facts and circumstances of this case the carelessness, negligence, and laches of the plaintiff are the direct and proximate cause of the loss, and, therefore, it is estopped from claiming reimbursement from the Gretna Trust & Savings Bank, in Liquidation.” Young v. Gretna Trust & Savings Bank, 184 La. 872, 168 So. 85, 90. See, Ideal Savings & Homestead Ass’n v. Kerner, 208 La. 513, 23 So.2d 200.
 

 The above doctrine was further enunciated in the case of Whittington Co. v. Louisiana Paper Co., Ltd., Inc., 224 La. 357, 69 So.2d 372, 375, as follows:
 

 “All of the facts and circumstances of this case convince us that, although the defendant was perhaps negligent or remiss in not making the rental payments in the manner prescribed in the leases, it was the carelessness, negligence, and laxity of the plaintiff which enabled Flournoy to continue his misappropriations for so long a period without detection, and the equitable doctrine that,
 
 as between two innocent persons, the one who most contributed to the loss should bear the consequences
 
 
 *239
 
 is applicable to this case. Young v. Gretna Trust & Savings Bank, 184 La. 872, 168 So. 85.
 

 “To us there can be no question that the carelessness, negligence, and laxity of the plaintiff contributed in' so great a degree to its loss that it now has no .right to be reimbursed by the defendant for its loss. Pearlstone-Ash Grocery Co. v. Rembert Nat. Bank of Longview, Tex.Civ.App., 135 S.W.2d 559; Safeway Stores, Inc., v. King Lumber Co., 45 Cal.App.2d 17, 113 P.2d 483.” (Italics ours.)
 

 We are of the opinion that, under the facts .arid circumstances of this case, one of .the equitable rules is applicable here, and that is, “ * * * where one of two innocent parties must suffer loss through the fraud • of another, the burden of' the loss should be imposed on him who most' contributed to it.” Thompson v. Hibernia Bank & Trust Company, 148 La. 57, 86 So. 652; Haley v. Woods, 163 La. 911, 113 So. 144; Young v. Gretna Trust & Savings Bank, 184 La. 872, 168 So. 85. Therefore, the- partnership is estopped from claiming reimbursement from the Pioneer Bank & Trust Company.
 

 The conclusion which we have reached renders it unnecessary to consider other questions presented.
 

 For the reasons assigned, the judgment of the lower court is reversed and set aside, and plaintiff’s suit is dismissed at its cost.