REID, Judge.
This matter is before this Court on a motion for summary judgment filed by the defendant under LSA-C.C.P. Article 966.
Plaintiff, Texas Gulf Producing Company, brought this action against Gulf Coast Drilling & Exploration, Inc., for alleged damages arising out of the failure to pay renewal rental on an oil, gas and mineral lease. Plaintiff held an oil, gas and mineral lease from John Nunez, dated September 8, 1955, affecting 71.22 acres in Vermillion Parish, Louisiana. By letter agreement executed by Texas Gulf on August 19, 1957 and by Gulf Coast on August 28, 1957, Texas Gulf agreed to sublease to Gulf Coast the Nunez lease and other leases and by instrument dated October 3, 1957, did sublease to Gulf Coast said Nunez lease “down to, but not below the stratigraphic equivalent of the sand shown at 10,664 feet on the Schlumberger log of the Continental-Norma LeBlanc Well No. 1, in Section 52, T 12 S, R 3 E Vermillion Parish, Louisiana, but only insofar as said leases cover the lands particularly described in said Exhibit ‘A-l’ ”. Under the agreement Gulf Coast obligated itself to:
“maintain the leases in force and effect as to the tracts hereby subleased by rental payment, shut-in royalty payments, drilling operations thereon, or production therefrom. If Subleassee does not elect so to maintain the subleased premises or any part or portion thereof, Sublessee shall reassign the subleased premises to Sublessor thirty (30) days prior to the rental or shut-in royalty date or the time drilling operations are required to be begun in order to perpetuate such leases and Sub-lessor hereby reserves the reversionary right of having such subleased premises reassigned prior to surrender or abandonment of the subleased premises.”
Plaintiff alleged that defendant failed to discharge its obligations under the agreement by failing to maintain the Nunez lease in force beyond September 8, 1959, and prayed for damages in the amount of $1,076,890.00 and interest.
Gulf Coast answered the complaint and denied any failure to discharge its obligations and on the contrary avers plaintiff itself undertook to make the payments required to keep the lease in effect after September 8, 1959 as to lands not in a producing unit and did make payment but in the wrong amount. In the alternative defendant avers,
“the plaintiff itself was contributorily negligent, which bars any recovery, in that plaintiff had an important interest in having the rental paid and undertook to make the payment; plaintiff had itself calculated the amount of rental to be paid and had the opportunity to pay the correct rental in the first instance; plaintiff furthermore was informed by the lessor by letter dated September 5, 1959 received by plaintiff before the anniversary date of the lease had elapsed that the *561 amount of rental tendered was in error, and thus had an opportunity to correct the error and to pay the proper amount and had the opportunity to notify respondent SO' that respondent would have an opportunity to correct plaintiff’s error and to pay the correct amount on time, but that plaintiff failed in all these respects.”
Defendant further alleged in its answer that in 1957 plaintiff undertook to explain to respondent the amount of delay rental due under the Nunez lease with respect to the acreage not included in the producing unit; defendant requested plaintiff to pay the rental for its account, which plaintiff did; in 1958 plaintiff again advised defendant of the amount of rental to be paid and inquired as to whether defendant would pay the same or desired plaintiff to pay for its account and defendant requested plaintiff to pay the rental in the amount specified by plaintiff, which plaintiff did; on August 17, 1959 plaintiff again wrote defendant noting,
“rental in the amount of $1,492.00 is due under the above lease on or before September 8, 1959, and asking whether respondent would handle the payment of the rental as had been done the previous year”
and on September 1, 1959, defendant wrote plaintiff agreeing that plaintiff pay the rental as it had done in the previous years. Defendant further alleged Texas Gulf on September 2, 1959 paid the rental determined by it to be due and on September 11, 1959 advised defendant the rental “was paid by us for your account as per your letter of instructions dated September 1, 1959.” Defendant assuming the position of plaintiff in reconvention, prayed for judgment against Texas Gulf Producing Company in the sum of $6,327.00. which it represented to be the value of Gulf Coast’s interest in said lease as to the land outside the drilling unit as of September 8, 1959.
Defendant then filed a motion for summary judgment alleging the Nunez lease contained a provision that if any of the land covered by it was included in a production unit with other land the lease as to the remainder not included in the unit could be held by the payment of specified delay rentals and defendant was obligated to maintain the lease or to reassign to the plaintiff 30 days prior to the date when payment of money or action was required to maintain the lease. The motion for summary judgment further stated plaintiff each year offered to make the delay rental payments for the account of the defendant, each offer being accepted, and twice plaintiff correctly paid the rental but the third time paid too little, having failed to take into consideration that by order of the Commissioner of Conservation of the State of Louisiana the number of acres of the Nunez lease being maintained by production had been reduced from 11.54 acres to 7.95 acres and delay rental at $25.00 per acre was due on the difference. The motion further states when the incorrect rental was received by John Nunez, lessor, he promptly gave written notice to plaintiff the payment was in error. Employees of plaintiff received the notice on the day on which rental was due, discussed the complaining notice, and had time and means with which to correct the error that day, but failed to do so.
Following argument the Trial Judge maintained the defendant’s motion for summary judgment. It is from that judgment that plaintiff has appealed.
In support of its motion for summary judgment, the defendant filed the discovery depositions of four of plaintiff’s employees, the discovery depositions of one of defendant’s employees taken by the plaintiff, and the deposition of John Nunez, the lessor, together with a letter of December 2, 1957 from the plaintiff to the defendant explaining to the defendant the amount of delay rental due under the Nunez lease with respect to the acreage not included in the producing unit.
The plaintiff, in opposition to the defendant’s motion for summary judgment, and in *562 order to controvert the allegations of fact made by the defendant in its motion for . summary judgment, and also to show what additional evidence would be introduced at the trial, offered the affidavits of seven of its employees, including the four whose depositions were offered by the defendant, together with 32 accompanying documents and the discovery deposition of Robert T. Jordan, an attorney who represented the defendant in a unitization hearing before' the Conservation Commission, and of C. Dale Armour, an employee of the defendant. Also filed in evidence were the original lease from John Nunez to Vernon Hawkins, the assignment from Hawkins to Texas Gulf, the original agreement of August 19, 1957 between plaintiff Texas Gulf and defendant Gulf Coast, and the original and corrective subleases entered into between plaintiff and defendant. It was upon these offerings and supporting documents that this case was heard.
In his written reasons for judgment, the Trial Judge stated in his opinion the issues involved should be broken down into three issues: first, the question of who ultimately paid the renewal rental, which question the Trial Judge stated was not in dispute and not at issue as the obligation rested with the defendant; second, who was to remit the rental to the lessor, which the Trial Judge stated was always done by the plaintiff and was not at controversy; and, third, which party was responsible for calculating the amount of rental to be paid each year, which the Trial Judge states was the central issue. The Trial Judge concluded it was the joint responsibility of the plaintiff and the defendant to determine the calculation of the renewal rentals; both had sufficient notice with' reference to the manner in which the renewal rental for 1959 should have been calculated; both parties were equally responsible for the failure to pay the proper rental to the lessor; therefore, the plaintiff could not recover damages from his own fault, nor was defendant entitled to recover from the plaintiff on its reconventional demand. The Trial Judge concluded “when a miscalculation was made as was made in this case, it was as much the fault of the plaintiff as it was the defendant and for that reason the plaintiff has no right to recover.”
The plaintiff alleged the Trial Court erred in finding it was the joint responsibility of the plaintiff and the defendant to calculate the amount of the rentals which had been tendered to the lessor.
LSA-C.C.P. Article 966 under which this proceeding was brought, reads as follows:
“ * * * The judgment sought shall be rendered forthwith if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law.”
As the Louisiana Supreme Court stated in Kay v. Carter, 243 La. 1095, 150 So.2d 27:
“The proceeding authorized in Louisiana Code of Civil Procedure, Article 966 et seq. concerning summary judgments is an innovation in our practice, and there is virtually no jurisprudence from the courts of this state relating to it. However, it was adopted with only minor, immaterial variations from Rule 56 of the Federal Rules of Practice; and, consequently, we are justified in considering the jurisprudence of the federal appellate courts pertaining to its proper application.”
In this connection the Federal Courts have set forth basic principles to be followed in a case such as this which are in the opinion of this Court apropos. As stated in Volume 6 of Moore’s Federal Practice, Second Edition, at page 2028, in discussing the function of motions for summary judgment, there appears the following ;
“The summary judgment procedure prescribed in Rule 56 is a procedural *563 device for promptly disposing of actions in which there is no genuine issue as to any material fact. In many cases there is no genuine issue of fact, although such an issue is raised by the formal pleadings. The purpose of Rule 56 is to eliminate a trial in such cases, since a trial is unnecessary and results in delay and expense which may operate to defeat in whole or in part the recovery of a just claim or the expeditious termination of an action because of a meritorious defense that is factually indisputable. ‘The very object of a motion for summary judgment is to separate what is formal or pretended in denial or averment from what is genuine and substantial, so that only the latter may subject a suitor to the burden of a trial.’[1]
It is also important in a motion for summary judgment in determining whether or not there are disputed facts, to distinguish what constitutes disputed facts and what constitutes disputed interpretations of undisputed facts. This distinction is the central issue in the case at bar. There are various facts, which, if shown to be undisputed as alleged in defendant’s motion for summary judgment, would entitle the defendant to have its motion for summary judgment maintained regardless of what interpretation the plaintiff could place upon them at a trial of the case on the merits and it is to these facts that we now address ourselves.
There is no dispute as to the fact that John Nunez granted an oil, gas and mineral lease to Verne Hawkins, which said lease was assigned to plaintiff. It is also undisputed this lease contained a provision sometimes called the Pugh clause, which provided that drilling operations or production from any unit which did not embrace all of the lessor’s land would not hold that part of his land outside the unit, but that such outside part could be held by the payment of delay rentals of $25.00 an acre. It is also undisputed that by letter agreement of August 19, 1957, the plaintiff and the defendant agreed that the defendant would drill a well on part of the Nunez property and if it drilled the well it would become a sublessee of Texas Gulf as to the shallow rights to the depth of 10,664 feet, subject to a reserved overriding royalty in favor of Texas Gulf. This agreement also stated the Nunez lease had a delay rental in the amount of $1780.-50 accruing September 7, 1957 and “if operations (sufficient in Texas Gulf’s opinion to obviate the necessity in paying such rental) have not been commenced by you on or before September 5, 1957, Texas Gulf shall pay the delay rental under such lease and you agree to reimburse Texas Gulf for the full amount of such rental so paid.” It is also undisputed that defendant drilled the well and the sublease was made, subject to all of the terms and conditions of the letter agreement of August 19, 1957, and the sublease provided sub-lessee shall “maintain the lease in force and effect as to the tracts hereby subleased by rental payment, shut-in royalty payment, drilling operations thereon, or production therefrom. If Sublessee does not elect so to maintain the subleased premises or any part or portion thereof, Sublessee shall reassign the subleased premises to Sub-lessor thirty (30) days prior to the rental or shut-in royalty date or the time drilling ■ operations are required to be begun in order to perpetuate such leases and Sublessor hereby reserves the reversionary right of having such subleased premises reassigned *564 prior to surrender or abandonment of the subleased premises.”
The sublease further contained a reservation by the plaintiff as sublessor of all rights and interest lying below the said stratigraphic equivalent of the sand shown at 10,664 feet on the Schlumberger Log of the Continental-Norma LeBlanc #1.
It is, therefore, clear and undisputed the plaintiff had an interest in the lease and it was, therefore, to the plaintiff’s benefit that the lease be maintained in full force and effect. It is also undisputed that each time the rental payment came due the rental was paid by the plaintiff for the account of the defendant.
In the opinion of this Court the central issue raised by the defendant in its motion for summary judgment is whether or not the plaintiff, through its own action, was jointly responsible for the cancellation of the lease, and whether or not plaintiff had sufficient knowledge or notice in its possession which would have informed it there was a dispute as to the rental payment and whether or not it could have done anything about it.
The record is clear plaintiff Texas Gulf had an interest in perpetuating and maintaining the lease in effect. This is borne out by the sublease wherein the plaintiff reserved all rights and interest lying below the stratigraphic equivalent of the sand shown at 10,664 feet on the Schlum-berger Log of the Continental-Norma Le-Blanc #1, and also reserved an overriding royalty on that portion subleased to defendant. The fact that the plaintiff felt the reservation of all sand below 10,664 feet was of value is evident from its filing of this suit and from the affidavits of its employees filed herein.
It is undisputed Texas Gulf had knowledge of all the terms and conditions of the lease granted to its assignor by John Nunez, the original lessor, including the so-called “Pugh clause” that drilling operations or production from any unit which did not embrace all of lessors land, would not hold that part of his land outside of the unit but such outside part could be held by the payment of delay rentals of $25.00 an acre. Thus, the plaintiff knew if a well was drilled, as was the case herein, and a portion of the land placed within the unit, that portion outside of the unit would not be held by production but could only be held by rental payments.
The sublease provided the defendant was obligated to maintain the lease in force and effect either by rental payment, shut-in royalty payment, drilling operations thereon, or production therefrom, and if the sub-lessee (defendant) did not elect to maintain the lease, the sublessee should reassign the lease to the sublessor 30 days prior to the rental or shut-in royalty date or the time drilling operations were required to be begun in order to perpetuate the lease and sublessor reserved the right to have the lease reassigned prior to surrender or abandonment of the subleased property.
It is also’ undisputed that in accordance with its agreement the defendant did drill a well and, therefore, was granted the sublease, and after the drilling of the well the rental on the balance of the leased premises not included in a unit established for the well, was paid by the plaintiff for the account of the defendant. These payments were made for the years 1957 and 1958, and an attempted payment was made in 1959, the incorrectness of which forms the crux of this suit.
Much of this case turns on the question as to whether or not the computation of rental payments was a joint process as alleged by the defendant in support of its motion for summary judgment and as held by the Trial Judge in his reasons for judgment, or whether or not it was the sole obligation of the defendant as argued by the plaintiff.
It is clear from the record that although the facts may be disputed as to whether or not the determination of the rental payments was a joint process, nevertheless *565 the facts are undisputed that from the very inception of the agreement the plaintiff took an active part in the determination of the payment and had at least as much knowledge of all facts concerning the correctness of the payments to be made as did the defendant. The original letter agreement of August 19, 1957, introduced as Plaintiff’s Exhibit No. 3, sets forth the original delay rental which would accrue as of September 7, 1957 if operations sufficient in the plaintiff’s opinion to hold the lease had not been commenced on or before September 5, 1957, and under said agreement the plaintiff stated if those operations had not ■commenced it would pay the delay rental and defendant would agree to reimburse it for the full amount of said rental. After the drilling of the well the first basic computation of rental payment was made by Texas Gulf. This computation is contained in a letter from Mr. H. S. Wallace, now deceased, of Teaxs Gulf to Mr. George M. Jenkins of Gulf Coast on December 2, 1957. This letter set forth the first rental to be paid under three different situations that might arise and went into detail as to how many days the rental should cover and how much per day it should be. The letter further stated Texas Gulf was setting up its records on the basis of that computation. By letter of December 11, 1957, in answer to Mr. Wallace’s letter, the defendant confirmed its request for the plaintiff to pay the rental due on the lease as outlined in plaintiff’s letter of August 2nd and stated “we note that the amount you recommend paying is $1,258.40.” In commenting upon this the Trial Judge stated while it was true Gulf Coast determined the rental to be paid in 1957, it followed precisely the calculations of Mr. Wallace. Texas Gulf took the responsibility of calculating the correct rental while the defendant took the responsibility of choosing which of the three situations was correct.
Concerning the determination of the rental to be paid in 1958, a representative of Texas Gulf wrote to the defendant that its records showed 59.10 acres of the subject lease were not included in any producing unit. and, therefore, it would be necessary to make a rental payment prior to September 8, 1958 in the amount of $1,-477.50. On August 21, 1958, the defendant replied saying “the 59.10 acre figure shown in your letter was apparently arrived at by substracting 11.54 acres, situated in the Nunez Unit, and .58 acres, situated in the LeBlanc Unit, from the total acreage figure 71.22. As a matter of precaution, since the .58 acres may be overlapped by the 11.54 acres, we would prefer to have the rental payment paid based on 71.22 acres less only the 11.54 acres leaving a total of 59.68 acres and a rental amount of $1,492.00.” The plaintiff paid the rental on that basis. As the Trial Judge pointed out, although the defendant changed the figures, it made the change in the calculation upon facts set forth in Mr. Wallace’s letter of December 2, 1957.
In connection with the rental payment for the significant year 1959, on August 17, 1959, Mrs. Emma Kuhn wrote the defendant as follows:
“Your attention is called to the fact that a rental in the amount of $1,492.-00 is due under the above lease on or before September 8, 1959.
“Will you please advise us if you will handle the payment of this rental or if you desire us to pay the rental for your account. In the latter event will you please advise if payment should be made identically as was made last year, in view of the pending controversy with this lessor.”
On August 31, 1959, Mr. William J. Craig, Jr., wrote the defendant referring to Mrs. Kuhn’s letter of August 17 and requesting a prompt answer in view of the early rental date. On September 1, 1959, the defendant, Gulf Coast in answer to the above two letters wrote plaintiff as follows :
“Regarding the rental payment on the captioned lease, referred to in your let *566 ter of August 17, 1959, it would please us if said rental payment would be made by Texas Gulf Producing Company identically as last year’s payment as the controversy mentioned still exists.”
It is interesting to note the letter from Mrs. Kuhn to the defendant clearly evidences a knowledge on the part of the plaintiff that there was a controversy with the lessor and in its answer the defendant clearly indicates to the plaintiff the controversy mentioned still existed, which' clearly should have placed the plaintiff on notice there was a dispute between the plaintiff and the lessor concerning the rental payment.
The depositions of Mrs. Emma Kuhn, the rental clerk of Texas Gulf who1 until September 1, 1958 was assistant manager of the land department of Texas Gulf and after that date was manager of the department, and Mr. Davis O. Fretz, an assistant to Mr. Craig, and Mr. William S. Am-merman, another employee of Texas Gulf show the actual mechanics of determining how and when the rental payment were made by the plaintiff. They indicate defendant authorized Texas Gulf to pay on its behalf a rental figure submitted to it by the plaintiff, with the right to make a correction in that rental payment if it saw fit. It is thus clear the plaintiff from the very beginning took an active part in the calculation of the rental payment due under the lease. The depositions of both Mr. Craig and Mr. Ammerman, together with other employees of the plaintiff, show that they were aware of the fact the amount of rental to be paid under the Nunez lease depended upon how many acres were in the producing unit and in order to hold the acreage outside of the producing unit, rental payments had to be made.
We concur with the Trial Judge’s holding plaintiff from the beginning had played a role in calculating the rental payments to be made. In view of this, it is next important to determine whether plaintiff had knowledge which would or should have indicated to it the rental payment due September 8, 1958 Was incorrectly figured,, and whether or not it was aware of all the facts and circumstances surrounding the' dispute over the rental payment, including' particularly the number of acres in and outside the producing unit prior to and subsequent to the Conservation Commission’s order of December 17, 1958.
It is apparent from the record that from the beginning the lessor, Mr. Nunez, was-dissatisfied with the treatment given him by both the plaintiff and the defendant. On December 20, 1957 Mr. .Nunez wrote’ the defendant stating he had received a rental check in the amount of $1,258.50 dated December 17, with no’ explanation-attached whatsoever. He asked for a detailed explanation and stated he did not feel he could accept the check until he knew what it was in payment of. On December 26, 1957, the plaintiff answered Mr. Nunez explaining the basis for the rental payment and stating “we were obligated to pay you a proportionate rental”. Again, sometime in 1958 the lessor Mr. Nunez wrote another letter to plaintiff Texas Gulf stating the check received “is in the amount of $1,492.00 with no explanation attached.” Mr. Nunez stated the recorded lease was 70.64 acres and asked that the payment be explained. By letter of September 3, 1958, plaintiff answered Mr. Nunez stating that as rental was paid under a sublease to Gulf Coast it was passing the letter on to Gulf Coast. On September 5, the defendant answered Mr. Nunez explaining to him that the rental payment was based on the total number of acres in the original lease less that part situated in the unit.
The plaintiff was well aware the lessor had refused to sign a voluntary unit and he was strenuously contesting the amount of royalty due him. This is shown by letter from Mr. C. D. Armour of Gulf Coast to Mr. William S. Ammerman of Texas Gulf, dated August 13, 1959, wherein the lessor threatened litigation concerning his royalty payments. Further notice of this. *567 ■dispute was contained in a letter of May ■6, 1959 from Mr. Nunez’s attorney to both the plaintiff and defendant wherein again the question of the inadequacy of the royalty was mentioned.
All of this should have put the plaintiff on notice by the time the rental payment of September 8, 1959 was due. The parties were dealing with a dissatisfied lessor who questioned not only the amount of rental due him but also the royalty payments.
With regard to the crucial part of this case, that is, the rental due September 8, 1959, the central issue revolves around the Conservation Commission’s order of December 17, 1958, as it was the result of this order that reduced the amount of acreage in the producing unit, thus increasing the .amount of acreage outside the unit by .3.64 acres, which resulted in the underpayment of $89.75. Thus, the question of whether plaintiff was aware of the Commission’s order becomes ' important in regard to whether plaintiff had or should have had knowledge upon which it could have acted and which would have indicated to it the rental payment made by it in September of 1959 was incorrect.
An examination of the record will show the plaintiff was aware of the division order and was or should have been apprised of sufficient facts to inform it there had been a change of acreage or that there was a high probability a change had been made. While it is true plaintiff was not represented by counsel at the hearing, nevertheless, Mrs. Lena Hodges, Secretary to the Commissioner of Conservation, stated in a sworn affidavit dated June 20, 1962, that notice of the hearing upon which the order was based was directed to Texas Gulf Producing Company, attention W. J. Craig. In addition, the notice was published in the State Times, Baton Rouge, Louisiana as directed by law, which in itself should have put the plaintiff on notice. Also, an examination of the testimony of plaintiff’s witnesses clearly shows that plaintiff was aware of the Commission’s order setting up the unit in this manner.
Mr. Ammerman, District Manager of Texas Gulf at Lafayette, testified he knew an application for the Commission’s order establishing the unit was made prior to the hearing and although he did not think he had seen the order, he testified he knew of the order. He stated although he could not remember when Mr. Gerald Greig of Gulf Coast (not to be confused with Mr. W. J. Craig, Jr. of Texas Gulf) visited him with a division order which had been revised because of the Commission’s order he would have no basis to doubt Mr. Greig’s statement it was on August 31 or September 1, 1959, prior to the expiration date of the lease and he further testified as follows:
“Q: You would freely admit at the time Mr. Greig talked to you and left the division order with you, you knew it was a different unit than had prevailed before the Commissioner’s order came out?
“A: Yes sir. There would have been no point in the revision of the division order otherwise.”
In addition, Mr. Ammerman had received a letter on August 13, 1959, from Mr. C. Dale Armour wherein specific reference was made to the Commissioner’s unit and wherein the 7.9 acres of the Nunez land contained in the 35.56 acres is mentioned. Mr. E. E. Parks and Mrs. Emma Kuhn had also initialed that same letter. Mr. Ammerman sent a copy of this letter to Mr. W. J. Craig, Jr. on August 17, 1959, so both Mr. Ammerman and Mr Craig had knowledge the Nunez acreage in the unit was 7.9 acres rather than 11.54 acres and that 3.64 acres had been dropped. Also, Mr. Ammerman acknowledged receipt of a letter of May 6, 1959 from Mr. Nunez’s attorney specifically referring to the Conservation hearing and making demand for back royalty payments. The attorney for Mr. Nunez stated both the plaintiff and defendant had attempted to pool *568 and unitize Mr. Nunez’s lands with other lands, this action was null and void, and unless a certain royalty payment was made suit would be brought to cancel the lease. That letter was seen by Mr. Ammerman and by Mr. Craig.
The plaintiff takes the position the letter of May 6 from Mr. Nunez’s attorney simply called to their attention there was a dispute as to the amount of royalty. However, if there was a dispute as to the amount of royalty arising out of the various units, it would be self evident to any experienced oil man there would also be a dispute as to the area in and out of the producing unit. In addition, Mr. Gerald P. Greig testified that sometime during the latter part of August or the first day of September he had contacted the plaintiff’s Lafayette office, seen Mr. Ammerman and shown him a copy of the- division order for execution by Texas Gulf and discussed the change of interest with Mr. Ammer-man and showed him a map prepared by Continental on which the unit was reflected. Mr. Greig testified that although the map was not the map attached to the Commission’s order, it was sufficient for the purpose of determining if the division order was accurate.
It is thus apparent the plaintiff had knowledge of the Commission’s order and the order would necessitate a change in the rental payment.
On September 5, 19S9, the lessor Mr. Nunez addressed a card to Texas Gulf at Houston, Texas, stating:
“We received a check dated September 4, 1959 for the sum of $1492.00 which we are holding, with no explanations of said sum. The lease is based on 71.22 acres. Will you please write and explain on what basis that sum was computed? We don’t understand nor know how that sum is arrived at. Our figuring and yours do not correspond.
Thank you for your consideration.” This was received by Mrs. Kuhn on September 8, 1959 and according to her testimony she took the card to- Mr. Fretz and discussed it with him. She stated “that we had had a similar letter the year before, practically the same wording, and we decided to send the card on to Gulf Coast and have them answer it.” Mrs. Kuhn testified she had not discussed the card with Mr. Ammerman or anyone else in her Lafayette office, nor did Mr. Fretz, nor had anyone in her company discussed it with Gulf Coast that day. She further testified she did not write Gulf Coast concerning the card until September 9, 1959, which was one day after the lease had expired. She further testified she knew the anniversary date of the lease was September 8. Mr. Fretz admitted he saw the card on September 8 and knew September 8 was the anniversary date of the lease and he contacted no one in his Lafayette office about it nor did he contact anyone connected with the defendant on that date concerning the card. Mr. Fretz testified:
“Q: When I asked you a moment ago, awhile ago, because we have spent some time looking through the file —
“A: Yes sir
“Q: About the interest of Texas Gulf in paying these rentals, you replied that it was the obligation of Gulf Coast to pay them?
“A: Yes.
“Q: But I would like to pursue the question a little bit. Texas Gulf did have an interest in having the rentals paid properly, did it not?
“A: Yes.
“Q: In order to- preserve its interests and the override would be one purpose, is that right?,
“A: Yes sir.
“Q: And then, also you were interested in the deeper horizons be *569 yond those that you had assigned or subleased to Gulf Coast?
“A: Yes sir.
“Q: So, it was important for Texas Gulf to see that the proper rentals were timely paid, is that correct?
“A: Yes sir.
“Q: And, as a matter of fact, you undertook to do that, did you not ?
“A: I undertook to do it for Gulf Coast.
“Q: And the protection of your own company ?
“A: And secondary for the protection of Texas Gulf Producing Company.”
Yet, knowing it was to the interest of the plaintiff to maintain the lease, Mr. Fretz did absolutely nothing on September 8, 1959 to make the correct rental payment either by recalculating the rental payment himself and making the correct payment, or by contacting Gulf Coast so they could attempt to make the correct payment.
The Trial Judge held that as a matter of fact the plaintiff and defendant, by their actions in the past, had agreed they would work together in determining the rental to be paid and the evidence shows they did work together on every occasion when the payment became due. He further held the evidence showed notice to the defendant with reference to the manner in which the renewal rental for 1959 should have been calculated. They both had knowledge of the Commission’s order and they both had knowledge of the change in the percentage of royalties which should have warned them they should have made new calculations of the renewal rental to he paid in September of 1959. With this holding this Court is in agreement.
We again emphasize it is undisputed the plaintiff had as much interest in seeing the correct rental payment was made as did the defendant, and the plaintiff had in its possession information upon which it could have acted and thus save the situation, namely, Mr. Nunsz’s communication of May 5. Not only did the plaintiff not act itself, but it failed to inform the defendant of the facts in order that the defendant might act.
It is a well established principle of law no one can recover damages for his own fault. This proposition is well stated by the Louisiana Supreme Court in Whittington Co. v. Louisiana Paper Co., Ltd., 224 La. 357, 69 So.2d 372, wherein the Court said:
“All the facts and circumstances of this case convince us that, although the defendant was perhaps negligent or remiss in not making the rental payments in the manner prescribed in the leases, it was the carelessness, negligence, and laxity of the plaintiff which enabled Flournoy to continue his misappropriations for so long a period without detection, and the equitable doctrine that, as between two innocent persons, the one who most contributed to the loss should bear the consequences is applicable to this case. Young v. Gretna Trust & Savings Bank, 184 La. 872, 168 So. 85.
“To us there can be no question that the carelessness, negligence, and laxity of the plaintiff contributed in so great a degree to its loss that it now has no right to be reimbursed by the defendant for its loss. * * * ”
Counsel for the plaintiff by the introduction of affidavits and by a lengthy and able brief has attempted to overcome the facts set forth in support of the defendant’s motion for summary judgment. However, it is the opinion of this Court that counsel’s contentions are disputed interpretations of undisputed facts.
Counsel for plaintiff cites various cases wherein motions for summary judgment *570 have been denied by both Federal and Louisiana Courts. Those cases are distinguishable in that they involved genuine issues of fact in dispute.
In the case of Kay v. Carter, supra, recently decided by the Louisiana Supreme Court, and one of the cases upon which' plaintiff relies, the Court found there was a genuine issue of fact as to whether the title in question was merchantable and remanded the case to permit the respective litigants to introduce evidence consistent with their pleadings. In the case at issue the question is not of disputed facts but merely of an interpretation of undisputed facts and a trial on the merits would not serve any purpose as this Court has before it all of the facts which a formal trial would produce.
It is the opinion of this Court that the situation in this case is similar to that set forth in the case of Fox v. Johnson & Wimsatt, 75 U.S.App.D.C. 211, 127 F.2d 729:
“ * * * There was conflict concerning interpretation of the facts and the ultimate conclusion to be drawn from them respecting intention. But there was none as to the facts themselves. In other words, the evidentiary facts were not substantially in dispute. The stricken affidavits were not different from the pleadings in this respect. Apart from the interpretative conclusions, they merely set forth the circumstances surrounding adoption of the resolution and subsequent resolutions and corporate acts. Their effect was merely to paraphrase the facts stated in the pleadings, adding detail and interpretative matter. Conflict concerning the ultimate and decisive conclusion to be drawn from undisputed facts does not prevent rendition of a summary judgment, when that conclusion is one to be drawn by the court. The court had before it all the facts which formal trial would have produced. Going through the motions of trial would have been futile. Judgment therefore was given properly for the defendant.”
The Trial Judge rejected the defendant’s reconventional demand, and correctly so. There is no question the defendant is also to blame for the loss of the lease through the improper rental calculations it having knowledge in its possession which would have enabled it to correctly calculate the payments due.
For the foregoing reasons the judgment of the Trial Court is affirmed, costs of the appeal to be borne one-half by the plaintiff and one-half by the defendant.
Affirmed.

. “Per Judge, later Justice, Cardozo in Richard v. Credit Suissee (1926) 242 NY 346, 152 NE 110 [45 A.L.R. 1041].”
“To attain this end, the rule permits a party to pierce the allegations of fact in the pleadings and to obtain relief by summary judgment where facts set forth in detail in affidavits, depositions, and admissions on file show that there are no genuine issues of material fact to be tried. * * * ”